GENERAL MOTORS CORPORATION, a corporation of the State of Delaware, Plaintiff,

v.

John A. VOLPE, as Secretary of Transportation, the Department of Transportation, Douglas W. Toms, as Director of the National Highway Safety Bureau, the National Highway Safety Bureau, and the United States of America, Defendants.

Civ. A. No. 4004.

United States District Court, D. Delaware.

Dec. 21, 1970.

on the present record the grounds for a temporary restraining order have not been laid. See the provisions of Rule 65(b).

Edmund N. Carpenter, II, Charles F. Richards, Jr., and David T. Dana, III, of Richards, Layton & Finger, Wilmington, Del., Frazer F. Hilder and Joseph Wackerman, General Motors Legal Dept., Detroit, Mich., Lloyd M. Cutler and William R. Perlik, of Wilmer, Cutler & Pickering, Washington, D. C., for plaintiff; Ross L. Malone, Gen. Counsel, General Motors Corp., Detroit, Mich., of counsel.

F. L. Peter Stone, U. S. Atty., Wilmington, Del., Frank Berndt, Office of the Chief Counsel, National Highway Safety Bureau, Dept. of Transportation, and Carl Goodman, Dept. of Justice, Washington, D. C., for defendants.

Arthur G. Connolly, Jr., of Connolly, Bove & Lodge, Wilmington, Del., Bruce L. Montgomery and Michael N. Sohn, of Arnold & Porter, Washington, D. C., for amici curiae, Ralph Nader, Larry Joel Silverman, The Center for Auto Safety, and Physicians for Automotive Safety.

## OPINION

CALEB M. WRIGHT, Chief Judge.

This case arises out of the General Motors Corporation's ("GM") efforts to obtain pre-enforcement judicial review of the National Highway Safety Bureau's ("NHSB") order of November 4, 1970, in which the NHSB directed GM to send a notification to the owners of certain pickup trucks stating that the wheels of the trucks contain a "defect which relates to motor vehicle safety" within the purview of the National Traffic and Motor Vehicle Safety Act of 1966 ("the Vehicle Safety Act" or "the Act") 15 U.S.C. §§ 1381 et seq., 1402(e). Because the defect notification provisions of the Act have survived these past four years untrammeled by judicial interpre-

tation [1] and because this case raises novel questions concerning judicial review of agency action, the Court's lengthy opinion must needs elaborate a good deal of background prior to discussing the issues raised by the present motions.

## I. FACTUAL BACKGROUND AND ADMINISTRATIVE ACTION.

From the documents, pleadings, affidavits and briefs presented to the Court thus far in this litigation, the following narrative statement appears to, be undisputed.

During the calendar years 1959 through 1965, the Chevrolet Motor Division and the GMC Truck & Coach Division of GM manufactured certain Chevrolet Series 20 and GMC Series 1500 pickup trucks [hereinafter referred to simply as "the trucks"] and offered them for sale during the model years 1960 through 1965.

Purchasers of the trucks were offered a variety of types of tires aside from the tubeless tire that was standard equipment. The selection of the tires and other optional equipment should be made on the basis of the purchaser's determination of the load-carrying capacity required for his intended uses of the truck. Among the tire options available during the model years in question were 15-inch, tube-type tires described as 7.00 x 15, 6-ply; 7.00 x 15, 8-ply; or 7.50 x 15, 8-ply. All of these 15-inch tires were mounted on 3-piece 15 x 5.50 wheels manufactured by the Kelsey-Hayes Company. During the model years in question GM sold approximately 200,000 trucks equipped with these wheels.

This case involves an alleged defect in the Kelsey-Hayes wheels. In general terms, GM has always contended that these wheels were suitable and safe for the normal or lower load-carrying capacities that it contends the purchasers of the trucks with Kelsey-Hayes wheels specified were acceptable to them. Had the purchasers intended to use the trucks for heavier loads, GM argues that the more expensive optional wheels and tires offered should have been purchased.

In September of 1966, Congress passed the National Traffic and Motor Vehicle Safety Act of 1966 for the avowed purpose of reducing "traffic accidents and deaths and injuries to persons resulting from traffic accidents." 15 U.S.C. § 1381. Impelled by the awesome destruction of human lives and property on the highways and concerned over serious allegations from many quarters that some automobiles presented serious hazards to safety,[2] Congress authorized the Secretary of Transportation, among other things, to establish automobile safety standards and to determine that a vehicle does not meet the standards or that a vehicle contains a defect relating to

---

1. The sole case cited to the Court relevant to the sections of the Vehicle Safety Act under consideration here is Chrysler Corporation v. Malloy, 294 F.Supp. 524 (D.Vt.1968), rev'd sub nom., Chrysler Corp. v. Tofany, 419 F.2d 499 (2nd Cir. 1969). This case, however, deals almost exclusively with the question of whether the federal statute and the safety standards promulgated thereunder preempted the field from state regulation. At least two other cases have upheld motor vehicle safety standards and the procedures utilized in establishing them. Boating Industry Assoc. v. Boyd, 409 F.2d 408 (7th Cir. 1969); Automotive Parts & Accessories Assoc. v. Boyd, 132 U.S.App. D.C. 200, 407 F.2d 330 (D.C.Cir. 1968).

2. See, e. g., R. Nader, Unsafe at Any Speed (1965).

The purpose of Congress can be gathered from the legislative history. See, e. g., Senate Report No. 1301 (89th Cong., 2nd Sess., 1966):

It should not be necessary to call again the grim roll of Americans lost and maimed on the Nation's highways. Yet the compelling need for the strong automobile safety legislation which the Commerce Committee is today reporting lies embodied in those statistics: 1.6 million dead since the coming of the automobile; over 50,000 to die this year. And, unless the accelerating spiral of death is arrested, 100,000 Americans will die as a result of their cars in 1975.

1966 U.S.Code Cong. and Adm.News, p. 2709. See also: House Report No. 1776 (89th Cong., 2nd Sess.1966); Cong. Record, Vol. 112 (1966).

motor vehicle safety and order the manufacturer of the vehicle to notify owners of the defect.

Since 1966 some standards have been set and a number of defects have been discovered both by manufacturers and by the NHSB, but this litigation represents the first time that a dispute has occurred between the NHSB and a manufacturer as to whether a vehicle contains a defect within the meaning of the Act.

By letter dated September 11, 1968, to GM, the NHSB initiated an investigation concerning the Kelsey-Hayes wheels that are the subject of this lawsuit.[3] Thereafter both GM and the NHSB conducted a series of investigative studies and exchanged information concerning reports of wheel failures and analysis of the wheels themselves. The parties disagree as to the results of these investigations—GM contending that the evidence of actual wheel failures indicates that virtually all of them occurred under overload conditions and that the metallurigical analysis indicates no inherent defect in the wheels and the NHSB now contending that (whether or not most actual failures occurred under overload conditions) there is evidence both from wheel failures and metallurigical analysis to support the conclusion that there is an inherent defect in the wheels. In any

event, Part I of the Investigation Report is dated April 2, 1969.

On April 21, 1969, GM advised the NHSB that although there was no defect and GM was not obliged to take any action under the Vehicle Safety Act, GM would send a letter to the truck owners to the effect that operation of the trucks in an overloaded condition with excess tire pressure might result in a safety hazard. The NHSB approved a final draft of this letter, and it was sent out on May 28, 1969.

During the summer of 1969, the NHSB sought to evaluate the effectiveness of the warning letter and otherwise continued its investigation. Part II of the Investigation Report is dated August 12, 1969, and by letter dated August 22, 1969, the Federal Highway Administrator (the departmental officer then charged with the responsibility for administering the Act) notified GM that, based on the investigations to date, it appeared that the wheels contained a "defect which relates to motor vehicle safety" and affording GM an opportunity to present its views on the matter. This is the procedure established by the Act, 15 U.S.C. § 1402(e).[4] On September 11, 1969, by letter and on September 12, 1969, at a conference in Washington, D. C., GM presented its position that its evidence contradicted any finding of a de-

---

3. This investigation was apparently precipitated by a letter to the Department of Transportation from Mr. Ralph Nader. During the early stages of this lawsuit, Mr. Nader as well as Mr. Larry Joel Silverman, The Center for Auto Safety, and Physicians for Automotive Safety sought leave to participate as *amici curiae*. General Motors opposed the participation of these persons, but, after informal argument, the Court granted leave to participate as *amici* in this litigation by order dated November 12, 1970. The Court is mindful that at least one appellate court has stated that *amicus* status should not be granted to all comers, [see, Strasser v. Doorley, 432 F.2d 567 (1st Cir. 1970).], but concluded that because the special interest and concern of the *amici*

in automotive safety generally and this dispute in particular has been amply demonstrated (as will appear from the Court's discussion of the history of this controversy) any assistance that counsel for these persons could render to the Court far outweighed the minor added difficulties for the parties' counsel and the Court which the participation of *amici* entails. The participation of able counsel for the *amici* thus far has supported the Court's earlier judgment in this matter.

4. 15 U.S.C. § 1402(e) provides:

(e) If through testing, inspection, investigation, or research carried out pursuant to this subchapter, or examination of reports pursuant to subsection (d) of this section, or otherwise, the Secretary

fect and that the failures were a result of abuse of the vehicles from overloading.

Before the NHSB finally determined whether or not there was a defect, GM made a settlement offer. By letter dated October 3, 1969, GM proposed that the investigation be concluded on the basis of GM sending a second notification to owners of the trucks offering to replace, at GM's expense, the Kelsey-Hayes wheels on all of the trucks on which campers or other special bodies had been or would be installed.[5] By letter dated October 8, 1969, the NHSB accepted GM's offer stating that it was in the public interest, but refusing to agree to GM's demand that the settlement would preclude the reopening of the investigation under the Act. The NHSB specifically reserved the right to take further action should the development of information on the wheels warrant it.[6] As a result of the agreement, the NHSB ter-minated the § 1402(e) proceeding, and GM sent out the notification and replaced the wheels of those truck owners who accepted the GM offer.

The matter rested in this status until March 31, 1970, when the present *amici curiae* filed suit in the District of Columbia against Secretary Volpe and most of the other defendants here to compel them to reconsider the question of whether there was a defect in the Kelsey-Hayes wheels on trucks without the special bodies or campers.[7] At a hearing on June 15, 1970, the NHSB apparently advised Judge Waddy that it was still investigating the matter. On June 26, 1970, Judge Waddy issued an Order finding that the plaintiffs (*amici* here) had standing to bring the suit and that the Court had jurisdiction to review the actions of the NHSB, and remanded the matter to the NHSB with orders to con-

---

determines that any motor vehicle or item of motor vehicle equipment—

(1) does not comply with an applicable Federal motor vehicle safety standard prescribed pursuant to section 1392 of this title; or

(2) contains a defect which relates to motor vehicle safety;

then he shall immediately notify the manufacturer of such motor vehicle or item of motor vehicle equipment of such defect or failure to comply. The notice shall contain the findings of the Secretary and shall include all information upon which the findings are based. The Secretary shall afford such manufacturer an opportunity to present his views and evidence in support thereof, to establish that there is no failure of compliance or that the alleged defect does not affect motor vehicle safety. If after such presentation by the manufacturer the Secretary determines that such vehicle or item of equipment does not comply with applicable Federal motor vehicle safety standards, or contains a defect which relates to motor vehicle safety, the Secretary shall direct the manufacturer to furnish the notification specified in subsection (c) of this section to the purchaser of such motor vehicle or item of motor vehicle equipment as provided in subsections (a) and (b) of this section.

5. Throughout the investigations it has been General Motors' contention that the wheel failures that have come to light resulted almost exclusively, if not exclusively, from overloading and that the primary cause of the overloading was that truck owners were equipping the trucks with campers and other special bodies that exceeded the load capacity of the trucks and particularly the wheels. See, e. g., Brief of General Motors in Support of Its Application for a Temporary Restraining Order, p. 5; Affidavit of A. T. Olson, p. 3.

6. Aside from the reservation of this right in the October 8th letter, a press release dated November 3, 1969, indicated that the NHSB intended to further investigate the trucks not equipped with special bodies or campers (approximately 150,000 out of the 200,000 manufactured) to "confirm the suspicion that the wheels may either be inherently defective or so likely to experience failure as to require corrective action. * * *" Defendants' Memorandum in Support of Their Motion to Dismiss, p. 4.

7. Nader v. Volpe, C.A. No. 960–70, Federal District Court, District of Columbia, filed March 31, 1970. This case was handled from its inception by Judge Joseph C. Waddy.

tinue its investigation and report back to the court by September 17, 1970.[8]

By letter dated September 14, 1970, the NHSB informed GM that it had "initially determined that a defect which relates to motor vehicle safety" exists in the Kelsey-Hayes wheels on trucks not equipped with campers or other special bodies. Enclosed with the letter was Part III of the NHSB's Investigation Report dated September 3, 1970. The letter advised GM of its right under § 1402(e) to present its views on this question at a meeting on September 30, 1970. GM did so by a letter dated September 29, 1970, which was delivered to the NHSB at the September 30th meeting.[9]

After reviewing the evidence and statements before it, the NHSB, by letter from Director Toms (a defendant here) to GM dated November 4, 1970, notified it of its determination that the trucks in question contained a defect relating to motor vehicle safety by reason of the Kelsey-Hayes wheels being subject to sudden and catastrophic failure resulting in an unreasonable risk of accident, death and injuries to persons. Accordingly, he directed GM to send a defect notification consistent with the requirements of § 1402(b) and (c) [10] to the owners of the trucks not equipped with campers or

special bodies.[11] The letter requested that GM advise the NHSB within a week as to whether or not it intended to comply with the order.

A reply of sorts was forthcoming from GM almost simultaneously with the November 4, 1970, letter from Director Toms. On November 4, 1970, GM filed suit in this Court seeking: (1) a temporary restraining order prohibiting the defendants from enforcing the November 4th defect notification directive, (2) postponement of the effective date of the directive pending judicial review, (3) preliminary and final injunctive relief to the same effect as (1) and (2) above, (4) a declaratory judgment holding the directive unlawful and void, and (5) a judgment setting aside the agency determination that there is a defect in the wheels.

On November 6, the Attorney General of the United States filed an enforcement action in the District of Columbia pursuant to the Act, 15 U.S.C. § 1399(a). *United States v. General Motors Corporation* (D.C.Civil Action No. 3298–70).[12]

On the same date, the NHSB reported these events to Judge Waddy pursuant to his Order of September 16, 1970 in *Nader v. Volpe.* Judge Waddy indicated to the plaintiffs in that case (*amici*

8. The Court further ordered the NHSB to permit Mr. Larry Joel Silverman (one of the *amici* here) to participate in all stages of the administrative proceedings except private negotiations between the NHSB and GM.

9. Counsel for Mr. Silverman also appeared at the September 30th meeting and presented evidence to support the finding of a defect.

10. 15 U.S.C. § 1402(b) and (c) provide:
(b) The notification required by subsection (a) of this section shall be accomplished—
(1) by certified mail to the first purchaser (not including any dealer of such manufacturer) of the motor vehicle or motor vehicle equipment containing such a defect, and to any subsequent purchaser to whom has been transferred any warranty on such motor vehicle or motor vehicle equipment; and

(2) by certified mail or other more expeditious means to the dealer or dealers of such manufacturer to whom such motor vehicle or equipment was delivered.
(c) The notification required by subsection (a) of this section shall contain a clear description of such defect, an evaluation of the risk to traffic safety reasonably related to such defect, and a statement of the measures to be taken to repair such defect.

11. The letter also directs GM to send the letter to owners of trucks with special bodies or campers who have not had their wheels replaced pursuant to the October 1969 settlement agreement.

12. It has been represented to the Court that this matter is also before Judge Waddy in accordance with the normal procedures of the Clerk of the District Court for the District of Columbia.

here) that it appeared to him that they had obtained the relief for which they had sued by reason of the November 4th directive.[13]

On November 9, 1970, this Court heard argument on GM's motion for a temporary restraining order prohibiting the NHSB from taking any steps to enforce its November 4th order. The Court's oral denial of this motion from the bench on November 9th is formalized in its Order filed November 10th. The stated grounds for denying the motion is the Court's conclusion that GM had failed to show that any irreparable injury would occur if the temporary restraining order was not granted. Thereafter, by letter from the Court dated November 12th, the Court denied GM's motion under 5 U.S.C. § 705 for a stay of the effective date of the November 4th order pending this Court's final decision based on the same reasoning which led to the denial of the temporary restraining order—no irreparable injury.

The motions presently before the Court are: (1) GM's motion for a preliminary injunction; (2) the defendants' motion to dismiss; (3) the defendants' motion to transfer the case to the District Court for the District of Columbia; and (4) GM's motion to strike the affidavit of Lawrence R. Schneider and all references in the briefs of the defendants and *amici* to reports not a part of the record of this case.[14]

## II. JURISDICTION.

The defendants' motion to dismiss raises the threshold question of the Court's jurisdiction to hear this lawsuit, a question which the Court would have had to decide in any event. The resolution of this matter is complicated by the varying standards that courts have applied under the three statutory grounds of jurisdiction asserted by GM—28 U.S.C. § 1337; the Declaratory Judgment Act, 28 U.S.C. § 2201; and the Administrative Procedure Act, 5 U.S.C. §§ 701–706. The defendants argue that, for a number of reasons, none of the statutes GM relies on properly grounds jurisdiction, and, moreover, that this action is a suit against the sovereign to which it has not consented and that the Court has no jurisdiction to enjoin the Attorney General of the United States. The *amici* argue only that where the statutory method of reviewing agency action is adequate, the Declaratory Judgment Act and the Administrative Procedure Act do not apply.

The Court intends to discuss each of the statutory arguments for jurisdiction, but prior to doing so two issues which would serve only to obfuscate the nature of this action and this opinion should be disposed of.

■ First, no constitutional questions are presented by the issues raised in this case, and the Court specifically rejects any contention that GM has been denied due process or that the defendants' insistence that the enforcement action now pending in Washington should continue rather than this action amounts to an attempt to deny GM due process. All parties and the *amici* are in agreement that GM is entitled to a full-dress, due process hearing before a federal district court at some stage in this dispute; and, despite some intimations to the contrary by GM at oral argument on the temporary restraining order, the

13. Plaintiff demurred from this view according to the transcript of the hearing. The government subsequently filed a motion to dismiss that is now pending.

14. Mr. Schneider is Acting Chief Counsel of the NHSB. His affidavit outlines the NHSB version of the administrative proceedings in this matter. The references to reports not a part of the record apparently refers to certain statements concerning the various parts of the Investigation Report in the NHSB public files.

Because of the Court's resolution of the motion to dismiss, it is unnecessary to decide this motion. Lest any ambiguity result, the Court expressly states that it does not rely on any of the statements which GM attacks by this motion.

Court does not read GM's brief or argument on these motions to say that the question of whether that due process hearing takes place before this Court or the enforcement court is of constitutional proportions.[15] Moreover, Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), the guiding light from the Supreme Court in this area and the main underpinning of GM's entire position, is not decided on due process grounds; indeed, the Court does not even mention a due process argument. Nor will this Court. We are concerned here with difficult matters of statutory interpretation, public policy questions and the proper exercise of judicial discretion—which are important to be sure, but not constitutional.

■ ■ Second, the defendants' two-pronged argument either that this action is a suit to which the government has not consented as is required by the doctrine of sovereign immunity or that the Court has no jurisdiction to enjoin the Attorney General is basically a makeweight. To begin with, these types of arguments have been rejected by the courts or not even raised by the government in so many cases like the present one that they now appear to be virtually frivolous reassertions of a per se rule of sovereign immunity that has been eroded by so many exceptions as to be no longer recognizable as a "rule." The Administrative Procedure Act is perhaps one of the foremost examples of this erosion, since it authorizes judicial review of a wide range of government actions and empowers federal courts to grant appropriate relief, injunctive or otherwise, against executive officials.[16] Moreover, an injunction, if issued in this case, would not issue against the Attorney General (although the Court can see no reason why that executive officer could not be enjoined in an appropriate case) but against the defendants Secretary Volpe, the Department of Transportation, Director Toms and the NHSB.

At bottom, this argument about the Court's lack of jurisdiction to entertain an unconsented suit against the government or enjoin the Attorney General is either an argument about the merits (i. e., the Attorney General and the defendants are legally correct in the course of action they are taking) or it begs the very question the Court must decide (i. e., because the jurisdictional statutes that GM relies on do not support this suit, it is not a suit to which the government has consented). Thus, the argument neither adds to nor detracts from the defendants' position that the applicable jurisdictional statutes do not support jurisdiction in this Court, and this opinion will not be further burdened by continued discussion of it.[17]

15. See, e. g., Ewing v. Mytinger & Casselberry, 339 U.S. 594, 599, 70 S.Ct. 870, 873, 94 L.Ed. 1088 (1950):
    [I]t is not a requirement of due process that there be a judicial inquiry before discretion can be exercised. It is sufficient, where only property rights are concerned, that there is at some stage an opportunity for a hearing and a judicial determination.

16. See, Scanwell Laboratories, Inc. v. Shaffer, 137 U.S.App.D.C. 371, 424 F.2d 859, 873–874 (1970); Estrada v. Ahrens, 296 F.2d 690, 698 (5th Cir. 1961); Schroeder Nursing Care, Inc. v. Mutual of Omaha Ins. Co., 311 F.Supp. 405, 409 (E.D.Wis.1970).

17. The cases cited by the government to support the sovereign immunity argument are largely beside the point. Two cases involved prosecutorial discretion in the enforcement of the criminal laws: Newman v. United States, 127 U.S.App.D.C. 263, 382 F.2d 479 (1967); Smith v. United States, 375 F.2d 243 (5th Cir. 1967) (suit under the Federal Tort Claims Act for failure to prosecute). St. Regis Paper Co. v. United States, 368 U.S. 208, 226, 82 S.Ct. 289, 7 L.Ed.2d 240 (1961) is cited only for the reference to Federal Trade Commission v. Claire Furnace Co., 274 U.S. 160, 173–174, 47 S.Ct. 553, 71 L.Ed. 978 (1927). Claire Furnace passed into practical oblivion with the Supreme Court's announcement of its decision in Abbott Laboratories v. Gardner, supra, if not before.
    The Abbott Court affirmed this Court's finding that jurisdiction was properly founded in that case over government

Considering GM's asserted statutory bases for jurisdiction in order of ascending complexity, 28 U.S.C. § 1337 provides:

> The district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies.

It seems obvious that the Vehicle Safety Act of 1966 is an "Act of Congress regulating commerce" in the natural sense of those words; the entire industry of manufacturing and selling automobiles is profoundly affected by its terms. The Court finds absolutely no grounds for disagreement with the opinion in *Chrysler Corp. v. Malloy*, 294 F.Supp. 524, 527 (D.Vt.1968) on this issue.[18]

■ Therefore, this Court has bare jurisdiction on the basis of this statute without more. The problem with § 1337 in this context, however, is that standing by itself it confers on the Court no power of remedy. Having jurisdiction, the Court must look to other statutes or judicial powers to indicate the course that should be pursued.

The Declaratory Judgment Act, 28 U.S.C. § 2201, provides such a remedy:

> In a case of actual controversy within its jurisdiction, * * * any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

Section 2202 allows a court to grant further relief based on the declaration of rights.

■ At least three issues need be discussed in relation to this statute. First, it is well settled that the Declaratory Judgment Act is not an independent ground for jurisdiction. See, e. g., *Schilling v. Rogers*, 363 U.S. 666, 676, 80 S.Ct. 1288, 4 L.Ed.2d 1478 (1960); *Thiokol Chemical Corp. v. Burlington Industries, Inc.*, 313 F.Supp. 253, 255–256 (D.Del.1970). GM must demonstrate that a federal statute grounds jurisdiction. As previously stated, the Court is of the opinion that 28 U.S.C. § 1337 will suffice for this because this "civil action" arises "under" an "Act of Congress regulating commerce."[19]

objections of exactly the same cast as this sovereign immunity argument. The rationale of the District Court opinion was modified considerably by the Supreme Court, but this Court's discussion of these same issues in that case is also applicable to this action. *Abbott Laboratories v. Celebrezze*, 228 F.Supp. 855, 862–863 (D.Del.1964).

18. The *amici* have not addressed any argument to the § 1337 ground for jurisdiction; the defendants argue that it does not constitute a consent to suit by the government or an independent basis to review agency action where another method of review is set out by the Vehicle Safety Act. The cases defendants cite to support this position are puzzling in this context: *Gager & Goldberg, Inc. v. United States*, 44 F.R.D. 477, 479 (D. Conn.1968) asserts a contrary result; *Payne v. Fite*, 184 F.2d 977, 979–980 (5th Cir. 1950) and *Doehla Greeting Cards, Inc. v. Summerfield*, 97 U.S.App. D.C. 29, 227 F.2d 44, 46 (1955) seem to hold that the matter in controversy was committed to the discretion of the Post-

master General or a subordinate, and, in any event, these cases are decided under another statute, 28 U.S.C. § 1339. Basically the defendants' argument here stems from their confusion of jurisdiction, "ripeness" and statutory remedies.

19. One might also argue that the Vehicle Safety Act itself is an adequate grant of jurisdiction. Section 1399 of that Act grants jurisdiction of enforcement actions to district courts, and one might assume that a declaratory judgment action on the same issues would be proper. But § 1399 contains serious limitations on its grant of jurisdiction:

> The United States district courts shall have jurisdiction * * * to restrain violations of this subchapter, or to restrain the sale * * * in interstate commerce, or the importation * * * of any motor vehicle * * * which is determined, prior to the first purchase of such vehicle in good faith for purposes other than resale, not to conform to applicable * * * standards, * * * upon petition by the appropriate United States attorney or

■ Second, in order to ground a declaratory judgment action one must show an "actual controversy." However, despite some arguments by the defendants that there may not have been a controversy until the government actually filed its enforcement suit in Washington two days after the filing of this action because of a lack of "final" action by the government, to deny the existence of an "actual controversy" on November 4, 1970, between these parties would strain these words to the point that they would, like other things perhaps, be "full of sound and fury and signifying nothing."

■ Third and most important, the declaratory judgment remedy is discretionary with the Court. The statute says a court "*may* declare" the rights of the parties. 28 U.S.C. § 2201. The proper exercise of this discretion in this case presents somewhat complicated issues that would best be discussed at a later stage in this opinion. See Part III of this opinion infra.

GM's main contention is that the Administrative Procedure Act, 5 U.S.C. §§ 701–706, supports the propriety of judicial review by this Court. Although GM seems to argue that the APA is an independent ground for jurisdiction, and the defendants did not disagree on this point (saying rather that it is not applicable to this case); the Court need not decide this question since it has already found in 28 U.S.C. § 1337 a proper jurisdictional basis for this action.[20]

Thus, the question the Court must now address is whether, jurisdiction being properly founded in this Court, the APA is applicable to the instant litigation. GM contends that it is applicable, based primarily on the Supreme Court's decision in Abbott Laboratories v. Gardner, supra. On the general question of the proper judicial attitude toward the provisions of the APA, the Court there stated, 387 U.S. at 140–141, 87 S.Ct. at 1511:

> The legislative material elucidating that seminal act manifests a congressional intention that it cover a broad spectrum of administrative actions, and this Court has echoed that theme by noting that the Administrative Procedure Act's 'generous review provisions' must be given a 'hospitable' interpretation. * * * Again in Rusk v. Cort, *supra*, 369 U.S. 367, at 379–380, 82 S.Ct. 787, at 794, 7 L.Ed.

the Attorney General on behalf of the United States.

One might strain the text and consider the allegedly erroneous defect notification order of the NHSB a "violation" of the Act which a district court would have jurisdiction to "restrain", but the further limitation that this jurisdiction be invoked by "petition" of the U. S. Attorney or the Attorney General could hardly be met in an action such as the present one.

20. The language of § 703 ("* * * any applicable form of legal action, * * * in a court of competent jurisdiction * * *") would seem to support the view that another ground for jurisdiction, like 28 U.S.C. § 1337, is needed, and some courts have so held. See, Pan American World Airways, Inc. v. C.A.B., 392 F.2d 483, 494, 129 U.S.App.D.C. 159 (1968) citing Kansas City Power & Light Co. v. McKay, 225 F.2d 924, 933, 96 U.S.App.D.C. 273 (1955), cert. den., 350 U.S. 884, 76 S.Ct. 137, 100 L.Ed. 780 (1955) ; Ove Gustavsson Contracting Co.,

Inc. v. Floete, 278 F.2d 912, 914 (2nd Cir. 1960), cert. den., 364 U.S. 894, 81 S.Ct. 225, 5 L.Ed.2d 188 (1960). Professor Jaffe has disagreed with this view, however, contending, among other things, that it is anomalous to require a showing of jurisdictional amount for federal question jurisdiction under 28 U.S.C. § 1331 before a citizen can obtain the "right" to judicial review that the APA grants him in § 702. L. Jaffe, Judicial Control of Administrative Action 164–65 (1965). In this case, for example, the GM complaint does not allege that the amount in controversy exceeds $10,000. Because 28 U.S.C. § 1337, which requires no jurisdictional amount, is applicable, this matters not at all; and the Court need not decide whether its inclination to agree with Professor Jaffe on this matter would lead to a decision to that effect in an applicable case. See Citizens Committee for the Hudson Valley v. Volpe, 425 F.2d 97, 101–102 (2nd Cir. 1970).

2d 809, the Court held that only upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review. [footnote and citations omitted]

This clear directive from the Supreme Court weighs heavily in favor of a conclusion that the APA applies to most administrative actions.

Turning to the statute itself, 5 U.S.C. § 701(a) states:

This chapter applies, according to the provisions thereof, except to the extent that—

(1) statutes preclude judicial review; or

(2) agency action is committed to agency discretion by law.

Since the defendants did not argue and the Court can see no basis for arguing that the administrative action in question is committed by law to agency discretion, the Court need concern itself only with determining whether the Vehicle Safety Act can fairly be said to "preclude judicial review."

■ The defendants contend that the enforcement action provided for in 15 U.S.C. § 1399 is exclusive and that such an action as the present one is barred by the meaning of the Vehicle Safety Act.[21] To the extent the Court has been able to discover, there is no legislative history to support this view and some legislative history of questionable probative value to support the proposition that the Congress may have intended that the APA be applicable to defect notification orders of the type in dispute here.[22] In any event, there is no "clear and convincing evidence", *Abbott* supra, 387 U.S. at 141, 87 S.Ct. 1507, to support the gov-

---

21. Perhaps the Court mischaracterizes the defendants' argument. They may be saying that the enforcement action is a "special statutory review proceeding" which is "adequate" and thus exclusive under the purview of § 703 of the APA. The Court believes the question of adequacy of the enforcement proceeding to be the crux of the case, and it will be reached in due time. But this question should not be confused, as the defendants do in their brief, with the question of whether the APA is applicable at all (§ 701) or with the question of whether the enforcement action is a "special statutory review proceeding." (§ 703).

22. Throughout the briefing and argument of these motions and the application for a temporary restraining order, the parties have made considerable reference to Senate Report No. 91–559 (91st Cong. 1st Sess., 1969) and particularly Appendices A and B thereof, which are letters to the Chairman of the Senate Commerce Committee from responsible officers of the Department of Transportation. This report is concerned with amendments to the Vehicle Safety Act that were proposed to the Senate in 1969 but not passed. Some of the amendments would have changed the defect notification provisions considerably by requiring the manufacturer to repair the defect at its own expense. The automotive industry apparently wanted a "substantial evidence test" if they were to be required to repair defects found by the Secretary.

The agency opposed this amendment, and argued that the industry was fully protected from arbitrary orders by reason of the *de novo* trial to which they were entitled in an enforcement action and the *Abbott* decision which, according to the Chief Counsel of the agency, entitled the manufacturer to seek a declaratory judgment action prior to enforcement.

The Court considers this Report to be of little probative value in determining what the Act as it stands means since the amendments were never made law. Any speculation as to why Congress did not adopt the amendments recommended by the Senate Commerce Committee is just that—speculation—and not legislative intent. The position taken by the agency in 1969 is relevant to some extent when interpreting an administrative act where policy matters are at issue, but the Court does not believe that an improper interpretation of *Abbott* by counsel to the agency should bind either the agency or, needless to say, this Court.

It is also worth noting that the Senate Report, for whatever value it might have, does not adopt the reading of *Abbott* that counsel to the agency urged. (See page 10 thereof.) Furthermore, under this Court's reading of *Abbott* the Chief Counsel's conclusion about pre-enforcement review might have been correct had the mandatory repair amendment to the Act been passed. See Part III of this opinion infra.

ernment position. Quite to the contrary, the Vehicle Safety Act has a saving clause identical to that which the *Abbott* court found so significant in the Food, Drug and Cosmetic Act, 21 U.S.C. § 371 (f) (6). Abbott Laboratories v. Gardner, supra at 144–146, 87 S.Ct. 1507. Section 1394(a) (6) provides:

> The remedies provided for in this subsection shall be in addition to and not in substitution for any other remedies provided by law.

In light of the discussion of this same language in *Abbott*, there is no good reason to discuss this point further—the Court concludes as a matter of law that the APA applies to the defect notification procedures of the Vehicle Safety Act.

Not surprisingly, § 701 states that when the APA applies, it applies "according to the provisions thereof." We must now determine whether other provisions of the APA bar this Court from reviewing the defect notification order in question *in this case*.

Section 703 of the APA provides:

> The form of proceeding for judicial review is the special statutory review proceeding relevant to the subject matter in a court specified by statute or, in the absence or inadequacy thereof, any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus, in a court of competent jurisdiction. Except to the extent that prior, adequate, and exclusive opportunity for judicial review is provided by law, agency action is subject to judicial review in civil or criminal proceedings for judicial enforcement.

Two questions arise from this section of the APA: (1) Is the enforcement proceeding "the special statutory review proceeding relevant to the subject matter"? and (2) If so, is the enforcement proceeding "adequate" within the meaning of § 703?

In regard to (1) above, the plaintiff and the defendants disagree. Defend-

ants argue that the enforcement action is the special statutory review proceeding under the Vehicle Safety Act, but surely this seems a strange interpretation of that language, particularly in the context of the second sentence of § 703. That sentence, providing that one can obtain judicial review *in an enforcement proceeding* if there is no "prior, adequate, and exclusive" review provided by law, raises the inference that a "special statutory review proceeding" is something other than an "enforcement-proceeding." Looking to the Vehicle Safety Act, there are plainly no provisions for judicial review of a defect notification order under § 1402(e) in marked contrast with the rather elaborate provisions in § 1394 for review in the courts of appeal of motor vehicle safety standards set by order under § 1392.

■ The government has cited no cases under the APA or other regulatory statutes with analogous procedures that would support the view that an enforcement proceeding under the Vehicle Safety Act is a "special statutory review proceeding" within the meaning of § 703 of the APA. Thus, the Court must hold that the enforcement proceeding now pending in Washington is not a special statutory review proceeding and thus that GM can obtain judicial review of the defect notification order by "any applicable form of legal action" if the other requirements of the APA and the case law interpreting it are met.

■ The question of the adequacy of the enforcement proceeding is not disposed of by reason of the disjunctive in § 703 of the APA ("in the absence *or* inadequacy thereof"). Section 704 of the APA provides in pertinent part:

> Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review.

The necessity that the Court consider in depth the adequacy of the enforcement proceeding for protection of GM's rights stems not only from the language of §

704 but also from general equitable principles applicable to the granting of injunctive relief and declaratory judgment as well as the doctrine of "ripeness" particularly pertinent to judicial review of administrative action. See, Abbott Laboratories v. Gardner, supra at 148–149, 87 S.Ct. 1507; L. Jaffe, Judicial Control of Administrative Action 395–423 (1965). As the Supreme Court did in *Abbott*, this Court will discuss these matters under the heading of "ripeness," although the judicial standards involved far exceed a common sense understanding of that term. In the administrative law area, one must agree with Professor Jaffe when he states at 395:

> The requirement of 'ripeness' as a condition for judicial review is not so much a definable doctrine as a compendious *portmanteau*, a group of related doctrines arising in diverse but analogically similar situations.

### III. "RIPENESS".

In Part II of the Supreme Court's *Abbott* opinion the range of issues to be considered under the ripeness *portmanteau* in cases such as the instant one are discussed in some detail. Two basic inquiries must be made:

> The problem is best seen in a twofold aspect, requiring us to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration. 387 U.S. at 149, 87 S.Ct. at 1515.

As to the first inquiry, "the fitness of the issues for judicial decision," the Court has no doubts. The November 4th defect notification order from the NHSB is clearly "final agency action" within the meaning of § 704 of the APA and the Supreme Court cases on this point. See, Port of Boston Marine Terminal Assn. v. Rederiaktiebolaget Transatlantic, 400 U.S. 62, 91 S.Ct. 203, 27 L.Ed.2d 203 (1970); Abbott Laboratories v. Gardner, supra at 149, 151–152, 87 S. Ct. 1507; United States v. Storer Broad-

casting Co., 351 U.S. 192, 76 S.Ct. 763, 100 L.Ed. 1081 (1956); Frozen Food Express v. United States, 351 U.S. 40, 76 S.Ct. 569, 100 L.Ed. 910 (1956); Columbia Broadcasting System, Inc. v. United States, 316 U.S. 407, 62 S.Ct. 1194, 86 L.Ed. 1563 (1942). The questions presented to the Court are not "purely legal" as were the issues in Abbott Laboratories v. Gardner, supra at 149, 87 S.Ct. 1507, but involve complicated factual as well as legal issues. Because these issues are otherwise fit for judicial determination, however, the Court does not attach a great deal of significance to this point: whichever court hears this case will have to decide these factual questions because the nature of the administrative order and the dispute requires it. This is also a case in which the impact of the order in question is sufficiently direct and immediate as to render the issues appropriate for judicial review at this time. Abbott Laboratories v. Gardner, supra at 152, 87 S.Ct. 1507.

The conclusion that the issues presented in this litigation are fit for judicial review does not, however, resolve the second inquiry arising from *Abbott* and the ripeness caselaw—"the hardship to the parties of withholding court consideration"—in favor of judicial review by *this* Court. This inquiry focuses more precisely on the question of the "adequacy" of the enforcement action now pending in Washington, and to this the Court now turns.

At the outset the Court should note that it is hard put to understand how this action could possibly be adequate for the protection of GM's statutory rights and yet the enforcement action be inadequate. For indeed the parties and the *amici* agree that each and every issue that could be decided in this action could also be decided in the enforcement action. GM's arguments to this Court on the comparability of the two actions seem to be contradictory. At an early point in this action, GM argued that the enforcement action would expose it to the enforcement penalties provided by 15 U.S.

C. § 1398(a),[23] but at another point counsel for GM stated that this Court, under its general equity powers in a declaratory judgment action would also have the power to fix penalties if it found the NHSB order valid.[24] At the argument on these motions, GM argues that no penalties could be imposed for GM's noncompliance with the order until GM has been given an opportunity to comply *after* a district court (either this Court or the enforcement court) has held the order to be valid and, presumably, ordered GM to comply.[25] The defendants did not take a position on the question of whether the Vehicle Safety Act's penalties for noncompliance with a defect notification order accrue when the manufacturer refuses to comply or when the manufacturer refuses to comply with a court order enforcing the administrative order.

If GM is correct in either of its contentions on this question of when the penalties are properly assessable, the Court is tempted to conclude that this case is merely a matter of the parties jockeying for the forum of their choice. To be sure, each side has accused the other of just that.[26]

Similarly, if GM is correct in either of its contentions the enforcement action is "adequate" within the meaning of § 704 of the APA and the ripeness caselaw, and the Court should dismiss this action in the proper exercise of judicial discretion.

■ This Court does not here decide when the § 1398(a) penalties become assessable. Because GM has alleged no other cognizable irreparable injury[27]

23. That section provides:
(a) Whoever violates any provision of section 1397 of this title, or any regulation issued thereunder, shall be subject to a civil penalty of not to exceed $1,000 for each such violation. Such violation of a provision of section 1397 of this title, or regulations issued thereunder, shall constitute a separate violation with respect to each motor vehicle or item of .motor vehicle equipment or with respect to each failure or refusal to allow or perform an act required thereby, except that the maximum civil penalty shall not exceed $400,000 for any related series of violations.

24. This would undoubtedly be the case if GM is correct in its contention that the defendants should be required to put the enforcement action into this case as a compulsory counterclaim under Rule 13(a) of the Federal Rules of Civil Procedure. The Court does not now decide whether this novel theory is correct.

25. To support this proposition GM relies on St. Regis Paper Co. v. United States, 368 U.S. 208, 225–227, 82 S.Ct. 289, 7 L.Ed.2d 240 (1961). GM claims to be here ,seeking only that relief which the Supreme Court held in *St. Regis Paper* it must seek in order to protect itself from penalties. The Court, however, finds this reading of the case erroneous because it seeks to obscure the fact that there the penalty provision specified a

penalty *for each day* of noncompliance with the FTC order in question. Thus, all during the judicial proceedings challenging the validity of the order the penalty mounted, and the Supreme Court held only that it was not a denial of due process to allow the penalties to aggregate when the paper company had taken none of the available measures to prevent the accrual of the penalties. In this case, however, the statute provides a flat penalty per vehicle involved with an absolute maximum of $400,000. In any case, if GM is correct in its view of *St. Regis Paper*, the mere bringing of this action should protect it from the adverse result announced in that case. Id. 368 U.S. at 226–227, 82 S.Ct. 289.

26. GM argues that it has a "right" to litigate in federal court in its resident state and refers to the "calmer atmosphere" here in Delaware on the issues of automobile safety. The defendants base their motion to transfer on convenience to the government and the experience of Judge Waddy in the earlier *Nader* litigation concerning the Kelsey-Hayes wheels. Whether forum shopping is the real disagreement between the parties and the reasons why the parties feel that one forum or another would be more favorable to them need not concern this Court.

27. Very briefly, GM presented four distinguishable grounds, aside from the question of civil penalties, for a finding

that might lead to the conclusion that the enforcement action is inadequate or that there is any "hardship" in dismissing this case and leaving GM to defend the enforcement action, the Court will assume *arguendo* for the remainder of this opinion that the penalties have been assessable since GM assumed a stance of noncompliance with the November 4th order from the NHSB and that the instant action carries no exposure to the penalties although the enforcement action does.

Contrary to GM's position on this issue, a position that can and should be offered to the enforcement court, the Court finds the notion that GM is subject to the penalties in the enforcement action not at all unreasonable. The Act states that "No person shall * * * fail to furnish notification of any defect as required by section 1402 of this title."

15 U.S.C. § 1397(a) (4). Section 1402 (e) (2) states that the Secretary, after following the procedures specified (which were followed in this case), "shall direct the manufacturer to furnish the notification" [of a defect to the purchasers of the vehicles]. Thus, it would seem that a manufacturer who fails to follow a § 1402(e) directive transgresses the prohibitory language of § 1397(a) (4) quoted above. Moreover, the enforcement or jurisdiction section of the Act, § 1399, provides that district courts have jurisdiction "to restrain *violations* of this subchapter." 15 U.S.C. § 1399(a) (emphasis added). If, as GM argues, the § 1398(a) civil penalties (for "whoever violates any provision of section 1397") apply only to those who violate a court order of enforcement, how could the conduct that the district courts have jurisdiction to restrain be a "violation"?

---

of irreparable injury in support of its motion for a preliminary injunction and to show that the enforcement action is inadequate: (1) the publicly known charge of "scofflaw" that results from the NHSB order, GM's noncompliance and the filing of the enforcement action hurts the reputation and good will of GM; (2) the allegation of a defect in the wheels in question will result in a loss of sales; (3) if GM has to send the defect notice, it will be forced to decide to repair the wheels at its expense (as it alleges it always does when a defect is discovered) at a cost, in this instance, of approximately $38 million; (4) the prejudicial effect of an admission that there is a defect on GM's posture in two class actions against GM by purchasers of these trucks in which the plaintiffs have claimed damages aggregating $290 million.

The Court finds these alleged injuries to be insufficient, either individually or collectively, to substantiate a finding of irreparable injury. This was the grounds upon which the Court previously denied a temporary restraining order. Since the Court need not decide the motion for preliminary injunction because it here grants the defendants' motion to dismiss, the Court can express its views on the legal sufficiency of these allegations to support a finding of irreparable harm without full factual discussion or encyclopedic citation of cases to support these conclusions.

Allegation (1) supra is an incident of every criminal or civil suit by the government and has never been thought to represent irreparable injury. See, e. g., Ewing v. Mytinger & Casselberry, Inc., 339 U.S. 594, 599, 70 S.Ct. 870, 94 L.Ed. 1088 (1950). In regard to (2), the Court cannot see how it will hurt sales since GM no longer sells any trucks with these wheels and has not done so for five years, and because the discovery of defects in automobiles has become somewhat of a commonplace. Allegation (3) is clearly insufficient because the law does not require GM to repair or replace the wheels in question, and a decision to do so is GM's act, irreparable injury to itself, so to speak. The final matter, (4), could only be sufficient if the NHSB could require GM itself to admit that there is a defect and if that evidence were admissible in a civil litigation involving these trucks. As to both of these matters the Court has serious doubt, but, in any event, any injury could be corrected when and if the enforcement court upholds GM's position.

The standards for irreparable injury are discussed somewhat further in the text of this opinion, infra, in relation to the hardship to the parties of withholding court consideration in this Court under the assumption that the penalties are assessable in the enforcement action and not here.

Assuming then that exposure to the penalties occurred when GM refused to comply with the NHSB order on November 4, 1970, by filing this action, we return to our inquiry into the hardship of denying this action to GM in that circumstance. As this Court reads the *Abbott* opinion there were two main considerations which led the Supreme Court to conclude that the hardship of withholding court consideration weighed in favor of granting access to pre-enforcement review under the APA: (1) that the only choices open to the plaintiffs there, compliance with the regulations or noncompliance, both carried serious costs for the plaintiffs; and (2) that the government did not show that judicial review under the APA would delay or impede the enforcement of the statute or adversely effect the public interest.

In regard to the first of these points, the Supreme Court stated at 152–153, 87 S.Ct. at 1517–1518:

> These regulations purport to give an authoritative interpretation of a statutory provision that has a direct effect on the day-to-day business of all prescription drug companies; its promulgation puts petitioners in a dilemma that it was the very purpose of the Declaratory Judgment Act to ameliorate. * * * If petitioners wish to comply they must change all their labels, advertisements, and promotional materials; they must destroy stocks of printed matter; and they must invest heavily in new printing type and new supplies. The alternative to compliance—continued use of material which they believe in good faith meets the statutory requirements, but which clearly does not meet the regulation of the Commissioner—may be even more costly. That course would risk

serious criminal and civil penalties for the unlawful distribution of 'misbranded' drugs. [footnotes omitted]

The Court went on to note that the plaintiffs in *Abbott* were in a "sensitive" industry in which public confidence was "especially important." *Id.* at 153,[28] 87 S.Ct. 1507.

Assuming but not deciding that GM in good faith believed the wheels in question not to contain a "defect which relates to motor vehicle safety" when it received the NHSB order on November 4th, it was placed in a difficult position. It could comply with an order that it believed erroneous and damaging to it and send out the notices required, or it could, as it did, refuse to comply and risk the penalties provided by the Act which add up to a $400,000 maximum.

But GM's difficulties at this point hardly compare with those that the drug companies in *Abbott* faced. Compliance would have cost them dearly—millions of dollars in materials would have had to be destroyed and millions more spent to invest in new labelling and promotional materials; and, as the Supreme Court noted, noncompliance "may be even more costly"—serious civil penalties and *criminal* penalties. By way of contrast, GM had a choice of either spending the money necessary to notify the purchasers of the trucks[29] or risking $400,000 in penalties. Thus, compliance was virtually costless to GM and noncompliance, the course selected, exposes GM to penalty only if GM is wrong on the merits of its contention that there is no defect. Four hundred thousand dollars is not an inconsiderable sum, but it is unlikely that that amount would be imposed in this case and certainly no GM official would risk a criminal penalty. Moreover, what is to most men and to the Court a stag-

28. The Court notes in passing that it does not consider the automotive industry, at least at this point in time, to be a similarly "sensitive" industry in which public confidence is "especially important."

29. GM did not offer any evidence to show the cost of sending out a defect notifica-

tion. In light of this and the obvious size of GM, the Court will consider this amount *de minimis* particularly because GM has already notified the same purchasers twice which probably decreases the cost of another notification still further.

gering sum of money is not nearly as significant to GM or, for that matter, to other American automobile manufacturers.

By far the most important distinction between this case and *Abbott*, however, is that here the administrative action had little or no effect on GM's current business.[30] GM does not now sell trucks with wheels of the type subject to the NHSB defect determination; it has not sold such trucks for five years. Thus, there could be no possibility of the order "requir[ing] an immediate and significant change in [GM's] conduct of [its] affairs." 387 U.S. at 153, 87 S.Ct. at 1518. No change in GM's present business of manufacturing cars and trucks is required by the NHSB order;[31] the parties have suggested none and the Court can imagine none. Therefore, to post-*Abbott* decisions by district court judges that GM relies upon heavily are inapposite: American Home Products Corp. v. Finch, 303 F.Supp. 448 (D.Del.1969); Upjohn Co. v. Finch, 303 F.Supp. 241 (W.D.Mich.1969). Quite apart from other distinguishable features of those cases, both district courts made clear findings that the business of each plaintiff would be substantially and irreparably impaired by the administrative action taken.[32]

The second factor that requires consideration in this case stems from the following language in the Supreme Court's *Abbott* opinion at 154 and 156, 87 S.Ct. at 1518 and 1519:

> Finally, the Government urges that to permit resort to the courts in this type of case may delay or impede effective enforcement of the Act. We fully recognize the important public interest served by assuring prompt and unimpeded administration of the Pure Food, Drug, and Cosmetic Act, but we do not find the Government's argument convincing. First, in this particular case, a pre-enforcement challenge by nearly all prescription drug manufacturers is calculated to speed enforcement.

> \*　　\*　　\*　　\*　　\*　　\*

> It is scarcely to be doubted that a court would refuse to postpone the effective date of an agency action if the Government could show, as it made no effort to do here, that delay would be detrimental to the public health or safety.

In the context of automobile safety legislation, the questions of delaying enforcement of the Act and the public interest are in actuality one and the same. The obvious purpose of 15 U.S.C. § 1402 is to notify vehicle owners of a safety-related defect as rapidly as possible (con-

---

30. GM's counsel's allegations that present sales would be adversely affected by a defect notification is somewhat incredible to the Court, and the underlying affidavit upon which counsel relies says only that the notification *"could* result in a substantial loss of sales." Affidavit of Mack W. Worden, Vice President of Marketing Staff, G.M. at ¶ 6.

31. See, ABC Air Freight Co., Inc. v. C.A.B., 419 F.2d 154, 160 (2nd Cir. 1970).

32. In American Home Products, supra 303 F.Supp. at 454, Judge Latchum states:

> In the present action the Commissioner, without making a final determination whether such reasonable grounds exist, has proceeded to order the removal of plaintiff's drugs from the market. This action is immediately and irreparably harmful to plaintiff and

anticipates either that no hearing will be held or that the outcome of a hearing will be favorable to the defendants.

In Upjohn Co., supra at 255–256, Judge Kent states:

> Thus it is clear that the issues being considered herein are 'ripe' for judicial resolution. It is equally clear that Upjohn can obtain effective relief from the Commissioner's order only in this Court, if Upjohn is entitled to such relief. Delay in the determination of the issues herein involved would, in practical terms, allow the Commissioner to effectively remove \* \* \* [the drugs] from the market, to the irreparable damage of Upjohn, before there is a determination that the Commissioner's interpretation of the pertinent provisions of the Act is proper in the light of the facts which may be adduced during an evidentiary hearing.

sistent with the time required for manufacturer and/or the NHSB to make a deliberate determination that there is a defect) so that the vehicle owners can take appropriate action to reduce the safety hazard—not only to themselves but also to others who use the highways.

GM contends that because of the District of Delaware's less crowded docket, the issues will be more rapidly determined here than they would be in the Washington enforcement action and that there is no danger to the public interest because (basically) there is no defect and because these trucks have been on the road for several years without causing a single death.[33] The defendants and the *amici* argue that the trucks are a serious safety hazard and that this type of action will delay the effective enforcement of the Act.

The Court will assume that GM's position that there is no defect in the Kelsey-Hayes wheel itself is correct, but this does not mean that the public interest requires or supports judicial review by this Court. If there is no defect, there is no harm; and the public interest should not be affected by when or where this controversy receives judicial scrutiny. But if there is a defect as the NHSB has determined, the public interest emphatically demands a rapid judicial decision enforcing the November 4th defect notification directive.

The Court cannot accept GM's argument that a swifter resolution of the issues in dispute would be achieved in this Court than in the District Court for the District of Columbia on the basis of unsupported allegations of the heavy Washington caseload. Moreover, whatever the situation in Washington may be, this Court knows its own situation, and, were this line of argument at all relevant to the *Abbott* Court's meaning in the language quoted supra on speeding rather than delaying enforcement, the Court could present GM with information concerning its own workload that might refute its position.

The Court concludes on this score that neither the enforcement action nor this one has any innate superiority for speeding enforcement of the statute. And much more important, when the Court's assumption in this case that the penalties are applicable in the enforcement action and not in this one is reasserted, it is the Court's view that when an enforcement action is filed promptly the *per se* denial of pre-enforcement review under the defect notification procedures of the Vehicle Safety Act will, in the long run, greatly enhance and expedite the enforcement of the Act. Were the situation markedly different, such as the state of affairs that might well exist if the NHSB had issued its order, received notice of non-compliance and failed to commence an enforcement proceeding for a substantial period of time, GM might be able to show that an action such as the instant one is appropriate and beneficial to the public interest.

The enforcement penalties, moderate though they are, have the advantage of discouraging automobile manufacturers from refusing to comply with defect notification orders in the future if their denial of a defect is obviously unmeritorious or calculated to delay. And, by forcing the automotive industry to resolve close decisions on whether to comply or not in favor of those whom the Vehicle Safety Act was designed to protect—the public constantly exposed to the dangers of moving automobiles—this procedure will best promote the purposes of Congress in enacting the Vehicle Safety Act.

---

**33.** GM has made much of the fact that the owners of these trucks have already been notified twice concerning the wheels in question. GM infers from this a lack of urgency in the NHSB's present attempt to require still another notice. The Court infers exactly the opposite conclusion. The previous notifications supplied to the Court by affidavit indicate that the truck owners were warned of the dangers to the wheels that result from overloading but were reassured that the wheels are safe if there is no overloading. Quite obviously, if the NHSB determination that there is a defect is correct, these earlier notifications make a new notification to that effect more urgent rather than less so.

Cf. *Ewing v. Mytinger & Casselberry, Inc.*, 339 U.S. 594, 601–602, 70 S.Ct. 870, 94 L.Ed. 1088 (1950).

For all of the foregoing reasons, the Court has determined that its proper course is to grant the defendants' motion to dismiss. As this opinion should make clear, the Court does not here decide that there is no possibility of pre-enforcement judicial review of an order issued under 15 U.S.C. § 1402(e); rather, the Court decides, based on the facts before it, that *this* action suffers from a lack of "ripeness" and should, therefore, be dismissed for lack of jurisdiction.[34]

Needless to say, this determination of the motion to dismiss absolves the Court of any necessity to consider the merits of GM's motion for a preliminary injunction or the defendants' motion to stay this action or transfer it.

The foregoing shall constitute the Court's findings of facts and conclusions of law.

Submit order in accordance herewith.

---

34. The Court might have preferred to call this a dismissal for failure to state a claim upon which relief can be granted under Rule 12(b) (6) because of a lack of equity in favor of GM's position or, in other words, because GM has a fully adequate remedy at law. But the Supreme Court has made it clear that the courts are without jurisdiction to hear a suit that cannot withstand the tests that the doctrines grouped under the term ripeness require. See, United States v. Storer Broadcasting Co., 351 U.S. 192, 197, 76 S.Ct. 763, 767, 100 L.Ed. 1081 (1956): "Jurisdiction depends upon standing to seek review and upon ripeness."