A. O. SMITH et al., Plaintiffs,

v.

**FEDERAL TRADE COMMISSION et al., Defendants.**

Civ. A. Nos. 75–15, 75–45 to 75–50, 75–56, 75–412, 75–415, 76–17 to 76–26, 76–36, 76–39, 76–56 and 76–60.

United States District Court,
D. Delaware.

April 30, 1976.

Richard F. Corroon, of Potter, Anderson & Corroon, Wilmington, Del., Edward T. Tait, Lee A. Rau, John M. Wood, Stuart M. Gerson, and Thomas H. Reilly, of Reed, Smith, Shaw & McClay, Washington, D.C., for plaintiffs and intervenor plaintiffs A. O. Smith Corp., et al. and Bemis Co., Inc., et al. in No. 75–15, and for American Air Filter Co., Inc., et al. and Bemis Co., Inc., et al. in No. 75–412.

William Simon, David C. Murchison, Harold F. Baker, J. Wallace Adair, John DeQ. Briggs, and Stuart H. Harris, of Howrey & Simon, Washington, D.C., for intervenor plaintiffs American Cyanamid Co., et al. in No. 75–412.

Donald J. Mulvihill, and Gerald J. Brown, of Cahill, Gordon & Reindel, Washington, D.C., for intervenor plaintiffs The Great Atlantic & Pacific Tea Co., Inc., in No. 75–15 and for Hoover Ball and Bearing Co. in No. 75–412.

Michael K. Wyatt, of Steptoe & Johnson, Washington, D.C., for intervenor plaintiff Atlantic Richfield Co. in No. 75–412.

Paul P. Welsh, of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for plaintiffs and intervenor plaintiffs Air Products & Chemicals, Inc., Allen-Bradley Co., Atlantic Richfield Co., Cargil, Inc., The Goodyear Tire & Rubber Co., C.I.T. Financial Corp., CPC International Inc., Hart Schaffner & Marx, Hobart Corp., Inland Steel Co., Thomas J. Lipton, Inc., Northwest Industries, Inc., Oscar Mayer & Co., Inc., Ross Industries, Inc., Square D Co., Sunstrand Corp., United States Gypsum Co., and Van Dorn Co.

Basil J. Mezines, of Stein, Mitchell & Mezines, Washington, D.C., for plaintiff C.I.T. Financial Corp.

Philip A. Lacovara, and Gerald Goldman, of Hughes, Hubbard & Reed, Washington, D.C., for plaintiffs Allen-Bradley Co. and Merck & Co., Inc.

Frank P. Cihlar, and James R. Henderson, of Mayer, Brown & Platt, Washington, D.C., for plaintiffs CPC International Inc., Cargill, Inc., Hart Schaffner & Marx, Inland Steel Co., Northwest Industries, Inc., Oscar Mayer & Co., Inc., Ross Industries, Inc. and Sunstrand Corp.

James F. Rill, and Kathleen E. McDermott, of Collier, Shannon, Rill & Edwards, Washington, D.C., for intervenor plaintiff Carpenter Technology Corp. in No. 75–412.

John F. McClatchey, and Leslie W. Jacobs, of Thompson, Hine & Flory, Cleveland, Ohio, for plaintiffs The Goodyear Tire & Rubber Company, Hobart Corporation, and Van Dorn Company.

John F. Graybeal, and Robert C. Houser, Jr., of Foley, Lardner, Hollabaugh & Jacobs, Washington, D.C., for plaintiff Square D Co.

James F. Bromley, of Macleay, Lynch, Bernhard & Gregg, Washington, D.C., for plaintiff United States Gypsum Co.

Edmund N. Carpenter, II, of Richards, Layton & Finger, Wilmington, Del., for plaintiffs and intervenor plaintiffs American Cyanamid Company, et al., The Great Atlantic & Pacific Tea Co., Inc., Carpenter Technology Corp., and Hoover Ball and Bearing Co.

Robert J. Lewis, Gen. Counsel, Gerald P. Norton, Deputy Gen. Counsel, Gerald Harwood, Asst. Gen. Counsel, James P. Timony, and William A. Cerillo, Dept. of Justice, Washington, D.C., for defendant Federal Trade Commission.

W. Laird Stabler, Jr., U.S. Atty., Dept. of Justice, Wilmington, Del., Rex E. Lee, Asst. Atty. Gen., Jack E. Thornton, Jr., and Harland F. Leathers, Dept. of Justice, Washington, D.C., for Gen. Accounting Office.

OPINION

MURRAY M. SCHWARTZ, District Judge.

## I. Introduction

Presently before the Court is a series of motions in a complex administrative law case [1] involving pre-enforcement challenges

---

1. To date some 24 separate civil actions have been filed in this district challenging various administrative orders issued under the two programs. They have been consolidated for disposition of the instant motions.

to two Federal Trade Commission ("FTC" or "Commission") programs, the Line of Business Program ("LB Program") and Corporate Pattern Reports ("CPR"). At issue are plaintiffs'[2] motions for a preliminary injunction and summary judgment,[3] the Commission's cross-motion for summary judgment,[4] its motion to dismiss, stay or transfer and plaintiffs' motion to stay consideration of the Commission's motion to dismiss, stay or transfer. For reasons developed below the Court holds that plaintiffs are not entitled to preliminary injunctive relief and grants the FTC motion to transfer the instant actions. As a result, the issues posed by the cross–motions for summary judgment, all of which sought declaratory or permanent injunctive relief, are not treated on the merits in this opinion. Prior to discussing the issues which are reached, it is appropriate to develop the factual background surrounding the two contested programs.

## II. *The LB Program*

The general facts regarding the LB Program have been extensively developed in three prior opinions insofar as the FTC's orders to file Form LB for fiscal year 1973 were concerned. *See A. O. Smith v. Federal Trade Commission ("A. O. Smith I")*, 396 F.Supp. 1108 (D.Del.1975); *A. O. Smith v. Federal Trade Commission ("A. O. Smith II")*, 396 F.Supp. 1125 (D.Del.1975); *A. O. Smith v. Federal Trade Commission*, 530 F.2d 515 (3d Cir. 1976). It is sufficient therefore to indicate that the LB Program was primarily designed to increase the accuracy and availability of data on industrial performance within specific lines of commercial activity.[5] The program, which was developed over a four year period commencing in 1970, sought to overcome the fact that standard forms of corporate financial reporting had become increasingly less meaningful as a result of what can best be described as conglomeratization, by requiring large diversified corporations to provide, *inter alia*. sales and cost data with respect to specific lines of product activity.[6] On March 26, 1974, the Commission approved 1973 Form LB and submitted it along with supporting statements to the Comptroller General for approval pursuant to the Federal Reports Act, 44 U.S.C. § 3512.[7] Following the Comptroller General's approval of a somewhat limited version

**2.** "Plaintiffs" also include the various corporate entities that have intervened in the various actions. All interventions were by stipulation of the parties.

**3.** Plaintiffs pursued summary judgment on the grounds that the LB and/or CPR Programs violate the following statutes and constitutional provisions: the Federal Reports Act, 44 U.S.C. § 3512; Section 4 of the Administrative Procedure Act, 5 U.S.C. § 553; 5 U.S.C. § 7, 6(2)(A); Section 6 of the Federal Trade Commission Act, 15 U.S.C. § 46; Section 9 of the Census Act, 13 U.S.C. § 9; the Packers & Stockyards Act, 7 U.S.C. § 181 *et seq.*; and the Due Process Clause of the Fifth Amendment.

Because of serious reservations the Court had as to whether its pre-enforcement jurisdiction should be exercised in the instant cases at the time of the March 31st hearing, argument in support of the respective cross-motions for summary judgment was not heard at that time. In addition, because of the plaintiffs' failure to demonstrate the existence of irreparable injury in the course of the hearing, I also declined to hear any argument whatsoever with respect to probable success on the merits of any of plaintiffs' substantive claims.

**4.** The Commission's cross-motion for summary judgment seeks judgment in its favor with respect to the various statutory and constitutional challenges raised to the LB and/or CPR programs by the plaintiffs. See note * * * page 1, *supra.*

**5.** ME–100, Supporting Statement, FTC Form LB, 1974 Survey Version, July 1, 1975.

**6.** *Id.*

**7.** 73 Administrative Record ("Ad.Rec.") 9D, 9E. The Court previously ordered the Commission to certify all materials considered by the Commissioners in their August 2, 1974, promulgation of Orders to File Form LB. The purpose of the Court's order was to compile an administrative record in order that a reviewing court could assess, on an informed basis, the plaintiffs' allegations that the FTC's decision to adopt the LB Program was arbitrary and capricious. *See A. O. Smith v. Federal Trade Commission ("A. O. Smith III")*, 403 F.Supp. 1000 (D.Del.1975).

of the form,[8] the Commission adopted a Resolution Requiring Annual Line of Business Reports from Corporations on August 2, 1974. This resolution, which subsequently appeared in the Federal Register, 39 *Fed. Reg.* 30377 (1974), led to Orders to File Form LB being served upon some 345 of the nation's largest commercial entities. Of those served, some 225 filed the required form for 1973 [9] while the bulk of remaining recipients of the Orders chose to challenge the FTC's action in the courts.[10] On April 20, 1976, the Commission directed that its 1973 LB enforcement orders be withdrawn against all companies which had not complied. As a consequence, all summary judgment motions and requests for relief to the extent directed to the 1973 LB Orders have been rendered moot. However, the controversy over the '74 LB Orders and LB Program itself remains very much alive.

The factual context surrounding the 1974 Line of Business Form is somewhat different than its predecessor. On April 16, 1975, the Commission published a notice in the Federal Register announcing the availability for public inspection and comment of a proposed 1974 Line of Business Form. 40 *Fed.Reg.* 17081 (1975). The notice further indicated that the Commission invited written comments on the proposed form and that it intended to hold an open hearing for the purpose of receiving oral comments on the proposed form on May 20, 1975. 40 *Fed.Reg.* 17081, 17348. In addition, copies of the proposed 1974 Form LB and related materials were mailed at that time to all companies which had been previously served with an order to file Form LB for fiscal year 1973.[11] At the May 20, 1975, hearing on 1974 Form LB some twenty witnesses presented oral statements to the Commission including representatives of

many of the plaintiffs in the instant cases.[12] On July 1, 1975, the Commission approved the final version of 1974 Form LB and transmitted it, along with a supporting statement, to the General Accounting Office for review pursuant to the Federal Reports Act, 44 U.S.C. § 3512.[13] On August 18, 1975, the General Accounting Office approved [14] 1974 Form LB for use by the Commission following its own solicitation of written comments. *See* 40 *Fed.Reg.* 28677. Immediately thereafter on August 20, 1975, the Commission authorized by resolution [15] the issuance of orders to file 1974 Form LB to some 453 companies. These orders, which were served subsequent to the August 20th resolution, required that the completed forms be returned within 150 days of receipt.

Between August 25, 1975, and December 19, 1975, 178 recipients of the 1974 Form, including all the plaintiffs in the instant action, filed motions to quash. The motions were denied on December 19, 1975,[16] the Commission stating its reason for so doing in a 19 page statement. The Commission at that time also withdrew the 1974 LB orders with respect to nine corporations and indicated that as to the remaining movants, the Commission would refrain from issuing notices of default or otherwise attempting to recover civil penalties from any noncomplying company unless the Commission had already instituted a proceeding seeking to enforce its 1974 LB order against such company pursuant to section 9 of the FTC Act, 15 U.S.C. § 49.[17] To date some 276 companies have already filed 1974 Form LB or plan to do so shortly, while approximately 145 other companies have chosen to challenge the orders in pre-enforcement review proceedings. Of this latter group, roughly 25 percent requested pre-enforcement relief

---

8. ME–17.

9. FTC Ex. AA.

10. *See, A. O. Smith I, supra; A. O. Smith II, supra; A. O. Smith III, supra; A. O. Smith v. FTC*, 530 F.2d 515 (3d Cir. 1976).

11. ME–81–6.

12. ME–96.

13. ME–100.

14. ME–132.

15. ME–174.

16. ME–168.

17. *Id.*

in this district while the remainder have instituted civil actions in the Southern District of New York.[18]

### III. *Corporate Patterns Survey*

Commencing in mid August, 1975, the Commission served on each of the plaintiffs in this action an order requiring them to complete certain special reports ("CPR Reports") as part of its corporate pattern survey. It is these reports which have triggered this portion of the instant litigation.

The CPR Reports, the basic purpose of which is to provide the Commission with individual data on the 1,000 largest domestic manufacturing corporations for assistance in its enforcements efforts, economic studies and policy planning activities,[19] consists of two basic forms, CPR–1 and CPR–2.[20] CPR–1, by far the more inclusive and significant of the two forms, seeks data on the 1972 value of shipments from domestic manufacturing establishments broken down by product class and the 1972 sum of establishment sales for all domestic establishments of a reporting company that are engaged in non-manufacturing activities. CPR–1 also seeks information on consolidated net sales and total assets as well as the listing of major acquisitions and disposals by reporting companies since calendar year 1972.[21] Form CPR–2, which is of far more limited applicability and scope, seeks information concerning minority interest domestic manufacturing companies and certain other types of joint ventures.[22]

The development of the instant CPR survey dates back to the fall of 1972 when the Commission authorized the collection of corporate patterns data for the year 1967. Following the submission of proposed CPR forms to the Office of Management and Budget in January, 1973, various changes were made including the base data year being changed to 1972.[23] The revised CPR forms were thereafter submitted to the GAO for review under the amended Federal Reports Act, 44 U.S.C. § 3512, in January of 1975. Following the receipt of numerous written comments received as a result of a notice in the Federal Register soliciting written comments from interested parties, GAO approved the CPR forms on March 24, 1975.[24] Final approval of the CPR survey occurred on July 29, 1975, and was published shortly thereafter in a Federal Register, 40 *Fed.Reg.* 34026 (1975), along with a Commission statement concerning the confidentiality of individual company data.[25] As a result of the resolution and statement, the Commission committed itself not to publish individual company data prior to January 1, 1978, or in other words, a point at least five years after the year for which the data was to be collected.[26]

Three hundred eighty-seven recipients of the special orders subsequently filed motions to quash. As a result of delay induced by the sheer bulk of issues and materials necessary to confront in determining the motions to quash, the Commission extended the filing deadline for the CPR reports to February 6, 1976, thereby obviating the

---

**18.** FTC Ex. AA.

**19.** 1975 Supporting Statement MX–15.

**20.** The CPR Reports also include another form, CPR–S, which is merely designed to aid the Commission in determining whether the company receiving such form is among the 1,000 largest corporations and should, therefore, be required to file CPR–1 and CPR–2. Only C.I.T. Financial Corporation, the plaintiff in Civil Action No. 76-39, is challenging an order to file form CPR–S.

**21.** See MX–4. In general, the form required data for calendar year 1972, but under certain circumstances allows a corporation to report the requested information on a fiscal year basis

when to do otherwise would require additional and unnecessary burdens. See MX–4 at 5.

**22.** MX–5.

**23.** See MX–15.

**24.** MX–35. It should be noted that in addition to approving the forms as being in compliance with the Federal Reports Act, the GAO communication of March 24, 1975, also discussed a number of matters regarding the reports which it felt were "a source of continuing concern."

**25.** MX–50.

**26.** MX–50.

original 90 day deadline.[27] On December 19, 1975, the Commission ruled upon the various motions to quash. Although the motions to quash the orders themselves were denied, the Commission withdrew the requirement that recipients complete item 5(d) of form CPR–1 and item 2(d) of form CPR–S.[28] The rulings were accompanied by a 32 page statement addressing the various arguments raised by the movants.[29]

As of February 17, 1976, some 647 recipients had submitted completed forms.[30] Between December 19, 1975, and February 6, 1976, the date on which most of the CPR forms were due, 12 suits were filed in this district challenging the CPR orders and seeking declaratory and injunctive relief. In all, some 70 companies are now before the Court as plaintiffs or intervenor plaintiffs seeking pre-enforcement review of the validity of the Commission's CPR orders.[31]

### IV. *Requests for Preliminary Injunctive Relief*

Both sets of plaintiffs (CPR and LB) seek various forms of preliminary injunctive relief. In particular they all seek to enjoin FTC publication of data collected or to be collected under both programs and additionally seek a *pendente lite* restraint upon Commission institution of enforcement proceedings, issuance of default notices, attempts to collect civil penalties for noncompliance or criminal prosecutions for failure to file the requested data. The LB plaintiffs also seek to enjoin the FTC from any further implementation of the entire LB Program.

■ The showings that must be made in this Circuit for issuance of a preliminary injunction are: 1) that the moving party has a reasonable probability of success on the merits; 2) that it will suffer irreparable injury *pendente lite* if the status quo is not maintained; 3) that the grant of a prelimi-

nary injunction would not substantially harm third parties interested in the outcome of the proceedings; and 4) that the public interest will not be adversely affected by the grant of preliminary injunctive relief. *A. O. Smith v. FTC*, 530 F.2d 515, 524–525 (3d Cir. 1976); *Delaware River Port Authority v. Transamerican Trailer Transport, Inc.*, 501 F.2d 917, 919–20 (3d Cir. 1974); *A. O. Smith I, supra; A. O. Smith II, supra.*

In addition to challenging the movants' assertions regarding probable success on the merits, the Commission takes issue with plaintiffs' claims of irreparable injury. Accordingly some perspective on the issue of irreparable injury is in order. As recently re-emphasized in *A. O. Smith v. FTC, supra,* 530 F.2d at 525–526 (3d Cir. 1976), the substance of this requirement "is that the feared injury or harm be irreparable—not merely serious or substantial. 'The word means that which cannot be repaired, retrieved, put down again, atoned for . .. Grass that is cut down cannot be made to grow again; but the injury can be adequately atoned for in money. The result of the cases fixes this to be the rule: the injury must be of a peculiar nature, so that compensation in money cannot atone for it . . ..' " *Id.* at 525 quoting from *Gause v. Perkins*, 3 Jones Eq. 177, 69 Am.Dec. 728 (1857). *See generally,* O. Fiss, *Injunctions,* 9–27 (1972).

■ The plaintiffs have advanced various arguments to demonstrate the existence of irreparable injury. Although some of the reasons have been urged by only one set of plaintiffs, i.e., either the LB plaintiffs or CPR plaintiffs, they will be treated together except to the extent that the specific factual context of each program requires differentiation. Both sets of plaintiffs point to the general burden of compliance required by the two programs. More spe-

27. MX–98.

28. MX–102.

29. MX–103.

30. FTC Ex. Z.

31. In addition, 65 companies have sued the Commission in the Southern District of New York challenging the Commission's CPR orders in similar pre-enforcement actions. *See Chamber of Commerce v. FTC*, Civil Action No. 76–128 and related cases.

cifically, the CPR plaintiffs point to what they describe as "unwarranted risks" stemming from their current choice as to compliance versus noncompliance. Among these so-called "risks" are such factors as the long lead time [32] allegedly required should a company eventually elect to comply. The lead time problem is exacerbated by the additional incentives to provide good quality data [33] that assertedly exist by virtue of the risk that recipients of the CPR Orders or their agents may be prosecuted should they provide misleading data and increased difficulty of data retrieval with the passage of time. Reduced to its essentials this argument appears to imply that the risks attaching to noncompliance are so great as to push one inexorably into compliance over a period of time should prompt review of their challenges not be forthcoming.

This argument seems to be seriously misplaced. While the dilemma of compliance versus non-compliance is most assuredly relevant to the issue of hardship to the parties of withholding court consideration and is thus properly considered with respect to the issue of this Court's exercise of pre-enforcement review, it proves nothing regarding irreparability. More importantly, the Third Circuit has held the burden of compliance itself, being an ordinary unrecoverable business expense resulting merely in a loss of profits, cannot, without a demonstration of some peculiar resulting harm, be considered an irreparable injury for preliminary injunction purposes. *A. O. Smith v. FTC, supra,* 530 F.2d at 527–528. Since nothing even remotely approximating any peculiar harm has been advanced by the CPR plaintiffs it is clear that they cannot claim to be irreparably injured should compliance ultimately prove to be necessary. In addition, the burden of compliance for the CPR reports is significantly less than that attaching to the 1973 Form LB, a level of burden which the Court of Appeals found specifically lacking in terms of irreparability.

The LB plaintiffs attempt to raise a new wrinkle by urging that the additional burden of a continuing program, when compounded by the changes instituted from year to year by the Commission, irreparably injure them by preventing adequate planning with regard to utilization of their corporate resources. The continuing nature of the LB program does not change the business expense character of the costs of compliance. Further there has simply been no credible evidence to support any claim that corporations of plaintiffs' magnitude are being so hampered in their future planning as to sustain any significant injury, let alone peculiar and unrecoverable harm.

Both groups also seek to enjoin the publication of any data already collected or to be collected under either program. The CPR plaintiffs simply analogize the proposed publication of what they claim will be seriously misleading data to defamatory material and further rely upon *GTE Sylvania, Inc. v. Consumer Product Safety Commission,* 404 F.Supp. 352 (D.Del.1975), for the proposition that government publication of misleading data may be preliminarily enjoined. The LB plaintiffs on the other hand, make a more complex, but nonetheless equally meritless, argument. They urge that the data collected to date will be so misleading as to cause substantial and serious errors to those relying upon the data.[34] The harm they posit from such allegedly improvident reliance is that industry-wide antitrust enforcement proceedings might be brought or that economically unwarranted competition might be unleashed upon them.

Although the FTC questions the standing of the plaintiffs to challenge the use of data submitted by other corporations, it is not necessary to reach that issue as a variety of other reasons preclude preliminary injunctive relief of the nature sought by plaintiffs. First, as to CPR the Commission has bound itself not to publish any data

---

**32.** *See,* e.g., MX–72 at 2; MX–85 at 3; MX–86 at 7.

**33.** *See,* e.g., MX–72 at 2; MX–86 at 7; MX–99 at 10–11.

**34.** *See,* e.g., ME–191.

*before* January 1, 1978. As a result, the remoteness of the asserted "danger" totally removes the need for *pendente lite* restraints since there is neither any immediacy or imminence to the alleged harms they seek to avoid. Secondly, the harms posited by the LB plaintiffs, i.e., industry-wide enforcement actions or unwarranted competition, are mere speculations largely unsupported by facts and, in any event, do not rise to a level of substantial and irreparable injury. As defendants in a now-hypothetical antitrust suit based on LB data, the instant plaintiffs would be able to challenge the accuracy of such data and thus possess an adequate legal remedy. Moreover, the mere fact of competition can never, by itself, be considered irreparable injury since it is entirely possible that the mythical new competitors might themselves be the entities crushed in the mortar and pestle of supply and demand. Finally, the reliance on *GTE Sylvania* is misplaced. There, the Court enjoined the publication of specific statistical data demonstrated to be misleading. Further, not only did the data directly relate to named television manufacturers, but the agency had already voted to publish the challenged data. Here, by contrast, the data, if and when published, will be aggregated on industry or product lines and thus

not directly related to particular companies. In addition, the Commission's own confidentiality guidelines prevent its publication of individual company data.[35] Finally, the fact that the Commission has not yet voted to publish the aggregated data currently in its possession [36] prevents a conclusion that in the absence of a preliminary injunction such publication would occur and cause irreparable injury.

Plaintiffs also seek preliminary injunctive relief against FTC issuance of default notices, institution of enforcement proceedings pursuant to section 9 of the Federal Trade Commission Act, 15 U.S.C. § 49, or attempts to collect civil penalties for failure to file the requested reports pursuant to section 10, 15 U.S.C. § 50. None of these requests is granted since, as to each, there has been no demonstration that, in the absence of a *pendente lite* restraint, the plaintiffs will be irreparably injured.

▆▆▆ First, as to default notices, it must be borne in mind that such notices, by themselves, carry no adverse consequences. *Aluminum Company of America v. FTC*, 390 F.Supp. 301, 309 (S.D.N.Y.1975). Moreover, there is no requirement that the Commission issue notices of default under section 10 [37] as a pre-condition to the commencement of mandamus-enforcement proceedings under section 9.[38] *Id.* 15 U.S.C.

**35.** *See* 39 *Fed.Reg.* 30970 (1974).

**36.** Although the Commission clearly intends *at some point* to publish aggregated LB data, 40 *Fed.Reg.* 30970 (1974), the absence of any proof that they intend to publish the data during the pendency of this litigation serves to render impossible a finding that the companies will suffer *immediate* and irreparable harm.

**37.** Section 10, 15 U.S.C. § 50 provides, in part, that:

"If any persons, partnership, or corporation required by sections 41 to 46 and 47 to 58 of this title to file any annual or special report shall fail to do so within the time fixed by the Commission for filing the same, and such failure shall continue for thirty days after notice of such default, the corporation shall forfeit to the United States the sum of $100 for each and every day of the continuance of such failure, which forfeiture shall by payable into the Treasury of the United States, and shall be recoverable in a civil suit in the name of the United States brought in the case of a corporation or partnership in

the district where the corporation or partnership has its principal office or in any district in which it shall do business, and in the case of any person in the district where such person resides or has his principal place of business. It shall be the duty of the various United States attorneys, under the direction of the Attorney General of the United States, to prosecute for the recovery of forfeitures. The costs and expenses of such prosecution shall be paid out of the appropriation for the expenses of the courts of the United States." As amended, Pub.L. 93–637, Title II, § 203(c), 88 Stat. 2199 (1975).

**38.** Section 9, 15 U.S.C. § 49 provides, in part, that:

"Upon the application of the Attorney General of the United States, at the request of the Commission, the district courts of the United States shall have jurisdiction to issue writs of mandamus commanding any person, partnership, or corporation to comply with the provisions of sections 41 to 46 and 47 to 58 of this title or any order of the Commission made in pursuance thereof."

§§ 49, 50. Plaintiffs point to a risk that they will be "branded [as] defaulters" and thus injured. This can most kindly be characterized as a makeweight argument. The only effect of a default notice is to fix the beginning of a 30-day period which must expire before civil penalties for non-compliance may attach. Section 10, 15 U.S.C. § 50. *See, U. S. v. San Juan Lumber Co.,* 313 F.Supp. 703, 705 (D.Colo.1969); *Aluminum Company of America v. FTC, supra* at 309. Similarly, the plaintiffs are not entitled to enjoin the Commission from seeking civil penalties, *if*[39] it decides to do so with regard to non-complying recipients of '74 LB and CPR orders. The non-issuance of default notices means that civil penalties cannot begin to accrue prior to the passage of 30 days from the point that any such notices become a reality. As a result it is obvious that no injury, whether irreparable or not, can now befall the plaintiffs insofar as civil penalties are concerned. Further, should default notices ever issue, the plaintiffs would be able to seek a stay of civil penalties during the pendency of a good-faith challenge to the validity of the Commission's order. *See, St. Regis Paper Co. v. U. S.,* 368 U.S. 208, 225–227, 82 S.Ct. 289, 299–300, 7 L.Ed.2d 240, 252–253 (1961); *Genuine Parts Company v. FTC,* 445 F.2d 1382, 1394–5 (5th Cir. 1971); *Continental Baking Company v. Dixon,* 283 F.Supp. 285 (D.Del.1968); *Aluminum Company of America v. FTC, supra* at 309. Accord, *Brown & Williamson Tobacco Corp. v. Engman,* CCH Trade Reg.Rptr. ¶ 60,473 (S.D. N.Y. Aug. 28, 1975), *aff'd* 527 F.2d 1115, CCH Trade Reg.Rptr. ¶ 60,649 (2d Cir. 1975). Moreover, the fact that in this case notices of default cannot issue in the absence of a pending enforcement proceeding not only underscores the lack of imminence in this context, but also guarantees the existence of a forum where plaintiffs may seek a *pendente lite* stay of civil penalties.

Finally, the Court of Appeals for the Third Circuit in an analogous context has indicated that a $100 a day civil penalty is *de minimis* as applied to corporations of the magnitude served with the CPR orders and thus, absent unusual circumstances not present here, cannot be considered as an irreparable injury. *A. O. Smith v. FTC,* 530 F.2d 515, *supra,* at 528.

■ Plaintiffs' request for preliminary injunctive relief with respect to the institution of enforcement proceedings must also be denied. Three reasons are proffered as to why the plaintiffs will suffer irreparable injury should enforcement proceedings be commenced as to them. They first assert that the sole issue in an enforcement proceeding under section 9, 15 U.S.C. § 49,[40] is "the enforceability of the [Commission's] orders."[41] As a result, they contend that they will be unable to raise the challenges that have been advanced in these pre-enforcement actions. This argument is without merit since the concept of enforceability as defined by plaintiffs must subsume the issues of validity and burdensomeness. Moreover, the challenges to the validity of the LB and CPR programs, and the respective sets of orders issued thereunder, raised by plaintiffs in the instant litigation may be asserted with equal effect in an enforcement proceeding. *Aluminum Company of America v. FTC, supra; Brown & Williamson Tobacco Company v. Engman, supra* at ¶ 67,675; *General Electric Company v. FTC,* 411 F.Supp. 1004, 1011 (N.D.N.Y.1976). *Cf. A. O. Smith v. FTC, supra,* 530 F.2d at 526; *General Motors Corporation v. Volpe,* 321 F.Supp. 1112, 1125 (D.Del.1970). Accord, *First National City Bank v. FTC,* CCH Trade Reg.Rptr. ¶ 60,671 (S.D.N.Y.1975).

■ The second argument advanced by plaintiffs to demonstrate their belief regarding the fundamental inadequacy of an enforcement proceeding is that they will be precluded from necessary discovery because

---

**39.** The Commission in the absence of enforcement proceedings, has agreed not to issue notices of default without which civil penalties may not be imposed upon any company choosing not to file either '74 Form LB or the CPR forms.

**40.** *See* note 40, *supra.*

**41.** Docket Item 68, Civil Action No. 75–412 at 140.

of the summary nature of such proceedings. In approaching this issue the Court has the twin advantages of recent guidance from the Third Circuit and nearly a year of managing and defining the applicable scope of discovery with respect to the '73 LB litigation. The Court's holding of last year that irreparable injury would occur because the scope of discovery in an enforcement proceeding is far narrower than in a plenary civil suit was premised, at least in part, on an assumption that was subsequently vitiated by this Court in *A. O. Smith III*, namely that discovery in pre-enforcement review would be unbridled. Instead, applying the provisions of Fed.R.Civ.Proc. 26(b)(1) which require that the scope of discovery be "relevant to the subject matter involved in the pending action" and, after analysis of the issues posed in this particular judicial review of administrative action, I sharply circumscribed the compass of discovery available to the plaintiffs. *See A. O. Smith III, supra* at 403 F.Supp. 1013. The Third Circuit has treated the remaining degree of variation between the scope of discovery in summary enforcement proceedings and a plenary pre-enforcement review of administrative action as non-existent or minimal for preliminary injunction purposes. *See A. O. Smith v. FTC, supra*, 530 F.2d at 526–527. In any event, the fact that potential differences are simply inchoate possibilities precludes issuance of a preliminary injunction on this basis since, as the Third Circuit has now held, positing a finding of irreparable injury on such a basis would seriously undermine the irreparability requirement which serves as an equitable restraint on the exercise of a court's extraordinary injunctive powers. *Id.* at 526.

Plaintiffs also suggest that the Comptroller General would not be amenable to suit in an enforcement proceeding with the result that they would be irreparably injured thereby. However, the plaintiffs have simply failed to carry their burden of demonstrating that absent the judicial imposition of restraint during the course of this litigation they will be unable to join the Comptroller General as a party in an enforcement proceeding or that the failure to do so would injure them in any material fashion. For example, there is nothing that would prevent them from petitioning the enforcement court to join the Comptroller General as a party. *See General Electric Company v. FTC, supra*, 411 F.Supp. at 1011. Alternatively, they might file another civil action against the Comptroller General in the enforcement forum and seek to thereafter consolidate it with the enforcement action *Cf. Abbott Laboratories v. Gardner*, 387 U.S. 136, 155, 87 S.Ct. 1507, 1519, 18 L.Ed.2d 681, 695 (1967). The Court does not mean to indicate that these are necessarily wholly viable options that would be embraced by an enforcement tribunal. However, the fact that plaintiffs have not made any substantial attempt to demonstrate the unavailability of these courses renders this argument an untenable basis for a finding of irreparable injury. In fact, the transfer, and stay pending transfer, that are granted below guarantee that the Comptroller-General will remain a party in the enforcement forum, and thus provides an incentive to seek consolidation with the enforcement proceeding in order to insure, if necessary, his presence. *See, General Electric Company v. FTC*, 411 F.Supp. 1011 (N.D.N.Y.1976).

Finally, plaintiffs claim that irreparable injury in the form of criminal penalties will descend upon them without a preliminary injunction. This argument deserves little judicial attention beyond observing that the criminal provisions of section 10,[42] 15 U.S.C. § 50, do not appear to

42. 15 U.S.C. § 50, provides, in part, that:
 "Any person who shall neglect or refuse to attend and testify, or to answer any lawful inquiry or to produce documentary evidence, if in his power to do so, in obedience to the subpoena or lawful requirement of the Commission, shall be guilty of an offense and upon conviction thereof by a court of competent jurisdiction shall be punished by a fine of not less than $1,000 nor more than $5,000, or by imprisonment for not more than one year, or by both such fine and imprisonment.
 "Any person who shall willfully make, or cause to be made, any false entry or statement of fact in any report required to be made under sections 41 to 46 and 47 to 58 of this title, or who shall willfully make, or

apply to corporations,[43] *see A. O. Smith v. FTC, supra,* 530 F.2d at 524, and that, in any event, the plaintiffs "have failed to prove that absent an injunction *pendente lite* they would be subject to criminal sanctions." *Id.* at 529.

As a result of the foregoing, plaintiffs' various requests for injunctive relief are denied on the ground that they have failed to demonstrate the existence of irreparable injury. Further, this determination precludes reaching the question of whether the plaintiffs have demonstrated a reasonable probability of success on the merits. *Cf. A. O. Smith v. FTC,* 530 F.2d 515 (3d Cir. 1976).

## V. Exercise of Pre-Enforcement Review

Of prime importance with regard to the '74 LB and CPR Orders is whether this Court should exercise its discretion and engage in pre-enforcement review of the two programs and their respective orders. For reasons detailed below the Court declines the invitation to exercise its pre-enforcement jurisdiction with respect to the CPR cases and instead transfers those cases to the District of Columbia where, in all likelihood, they will be consolidated with the now-pending CPR enforcement actions recently instituted by the Commission.

Similarly, the '74 LB cases will be transferred subject to formal institution of the imminently-forthcoming enforcement proceedings in the District of Columbia.

At the outset some conceptual observations should be made regarding the nature of pre-enforcement jurisdiction. First, it is clear that in determining whether to utilize pre-enforcement jurisdiction a court is not inquiring as to its jurisdiction over, and thus its *power* to decide, a particular class of cases. Note, "Jurisdiction to Review Administrative Action: District Court or Court of Appeals," 88 *Harv.L.Rev.* 980, 983–4 (1975); Comment, "Pre-Enforcement Review of Administrative Regulations," 42 *S.Cal.L.Rev.* 505, 506–7 (1969). *See generally,* Comment, "Timing of Judicial Review Under the Administrative Procedure Act," 56 *Cal.L.Rev.* 1491 (1968). Rather, the inquiry is whether the Court should exercise its discretion to grant pre-enforcement review. This inquiry is necessarily directed towards the existence of particular equitable factors upon which a court makes a determination to either grant or withhold judicial review at the pre-enforcement stage.[44] See, *Note, supra,* 88 *Harv.L. Rev.* at 983–4; *Comment, supra,* 42 *S.Cal.L. Rev.* at 506–7; *General Electric Company v. FTC,* 411 F.Supp. 1004, 1007, 1009 (N.D.N.

cause to be made, any false entry in any account, record, or memorandum kept by any person, partnership, or corporation subject to said sections, or who shall willfully neglect to fail to make, or to cause to be made, full, true and correct entries in such accounts, records, or memoranda of all facts and transactions appertaining to the business of such person, partnership, or corporation or who shall willfully remove out of the jurisdiction of the United States, or willfully mutilate, alter, or by any other means falsify any documentary evidence of such person, partnership, or corporation or who shall willfully refuse to submit to the Commission or to any of its authorized agents, for the purpose of inspection, and taking copies, any documentary evidence of such person, partnership, or corporation in his possession or within his control, shall be deemed guilty of an offense against the United States, and shall be subject, upon conviction in any court of the United States of competent jurisdiction, to a fine of not less than $1,000 nor more than $5,000, or to imprisonment for a term of not

more than three years, or to both such fine and imprisonment." As amended, Pub.L. 93–637, Title II, § 203(c), 88 Stat. 2199 (1975).

**43.** This conclusion as to the non-applicability of criminal provisions to corporations is strengthened by a recent Congressional *amendment of* section 10 which, *inter alia,* extended the coverage of *civil* penalties from corporations to "persons, partnerships or corporations." Pub.L. 93–637, § 203(c), 88 Stat. 2199 (1975). By contrast Congress left unchanged the provisions regarding the applicable scope of criminal penalties contained in section 10, which continue to apply solely to "persons" in a context which precludes any argument that "person" may also include corporations. See note 45, *supra.*

**44.** For an approach which would blur the above distinction, see *Floersheim v. Engman,* 161 U.S.App.D.C. 30, 494 F.2d 949 (1973), criticized in *Note, supra,* 88 Harv.L.Rev. at 992, n. 75.

Y.1976). *Cf. General Motors Corporation v. Volpe, supra,* 457 F.2d at 923. Secondly, the overriding issue involved in determining whether to exercise pre-enforcement jurisdiction is one of timing. *See Comment, supra,* 42 *S.Cal.L.Rev.* at 506–7. *See generally, Comment, supra,* 56 *Cal.L.Rev.* 1491. Thus, except for the extremely rare category of administrative actions that are explicitly made unreviewable by law, the question is not *if* judicial review will take place, but rather *when* it will occur. *Cf. Continental Air Lines, Inc. v. C.A.B.,* 522 F.2d 107, 128 (D.C.Cir. 1974). Finally, the decision whether to exercise pre-enforcement jurisdiction is discretionary. This stems both from the equitable nature of the injunctive and declaratory relief invariably sought in pre-enforcement challenges to administrative action, *see Abbott Laboratories v. Gardner,* 387 U.S. 136, 148–9, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681, 691 (1967), and section 10(c) [45] of the Administrative Procedure Act which authorizes a court to withhold review of agency action unless the party seeking such review possesses "no other adequate remedy in a court." 5 U.S.C. § 704. *Brown & Williamson Tobacco Corp. v. Engman,* CCH Trade Reg.Rep. ¶ 60,607 (S.D.N.Y. Nov. 5, 1975) at 67,674. *Accord, General Motors Corporation v. Volpe,* 321 F.Supp. 1112, 1124–6 (D.Del.1970).

 The Commission's motion to dismiss sharply challenges the Court's exercise of pre-enforcement jurisdiction with respect to both the '74 LB orders and the CPR Programs.[46] That challenge focuses attention on the *Abbott Labs* trilogy,[47] where the Supreme Court delineated two factors to be assessed in determining whether to utilize a court's equitable discretion and entertain a pre-enforcement challenge: "[t]he problem is best seen in a twofold aspect, requiring us to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Labs v. Gardner, supra,* 387 U.S. at 149, 87 S.Ct. at 1515, 18 L.Ed.2d at 691.

 The "fitness of the issues for judicial decision" standard is essentially an inquiry into the finality of the challenged administrative action, as well as an examination of the nature of the questions presented for decision. *See Id.* at 149–52, 87 S.Ct. at 1515–17, 18 L.Ed.2d at 691–93. In the instant cases there is no question that the Commission's actions in adopting the LB and CPR Programs and serving orders to file the '74 LB and CPR Forms are final. *A. O. Smith v. FTC, supra,* 530 F.2d at 524. In addition, all issues posed by the litigants for decision in both sets of cases are purely legal. *See Abbott Labs, supra,* 387 U.S. at 149, 87 S.Ct. at 1515, 18 L.Ed.2d at 691. Thus, there can be no serious dispute with a conclusion that the issues raised for pre-enforcement review are indeed fit for judicial decision.

Analysis of the other factor, namely hardship to the parties of withholding review, is far more troublesome. Little can be gained at this point from large-scale quotation of relevant passages from the *Abbott Labs* trilogy in view of the fact that both this court and the Third Circuit have recently provided an exhaustive presentation and analysis of the differing factual contexts presented in each branch of the trilogy. *See A. O. Smith v. FTC,* 530 F.2d 515 (3d Cir. 1976); *A. O. Smith I, supra; A. O. Smith II, supra.* Rather. it is sufficient to quote the Circuit's recent teachings on the trilogy's import:

"Thus, it appears from the Abbott Laboratories trilogy that one seeking discretionary relief may not obtain pre-enforce-

**45.** 5 U.S.C. § 704 provides, in part, that:
"Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to a judicial review. . . ."

**46.** No contention is raised as to whether there is a lack of subject-matter jurisdiction over the instant controversy since it is clear that these cases all raise matters that are within the court's jurisdiction by virtue of either or both 28 U.S.C. §§ 1331 and 1337.

**47.** *Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); *Toilet Goods Association v. Gardner,* 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967); *Gardner v. Toilet Goods Association,* 387 U.S. 167, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967).

ment judicial review if there is no immediate threat of sanctions for noncompliance, or if the potential sanction is de minimis. Conversely, the court should find agency action ripe for judicial review if the action is final and clear-cut, and if it puts the complaining party on the horns of a dilemma: if he complies and awaits ultimate judicial determination of the action's validity, he must change his day-to-day course of conduct, for example, by undertaking substantial preliminary paperwork, scientific testing and record keeping, or by destroying stock; alternatively, if he does not comply, he risks sanctions or injuries including, for example, civil and criminal penalties, or loss of public confidence." *A. O. Smith v. FTC*, 530 F.2d at 524.

Thus, it is clear that a significant, if not the sole, purpose of pre-enforcement review is to remove a party from the horns of the above quoted dilemma.

█ Review of the factual background of each program and its respective orders indicates that one of the two horns *may* well be lacking with respect to each program. At the time the Commission denied the various motions to quash filed by recipients of '74 Form LB, it resolved not to issue default notices or seek civil penalties from any non-complying company without having first instituted an enforcement proceeding against such party.[48] Since criminal penalties do not apply to the corporate recipients of the '74 LB orders [49] and since, unlike *Abbott Labs*, the plaintiffs do not face any loss of public confidence as a function of non-compliance, it appears that

"there is no immediate threat of sanctions for non-compliance." Plaintiffs take issue with this judgment and assert that because civil penalties may be instituted once enforcement proceedings are underway, they still face risks attaching to non-compliance with the result that both horns of the dilemma remain extant. Some authority arguably supportive of plaintiffs' position does exist, *Cf. Gardner v. Toilet Goods Association, supra*, 387 U.S. at 172, 87 S.Ct. at 1529, 18 L.Ed.2d at 708. Nonetheless, I believe a functional analysis of the relevant case law indicates that the dominant purpose of pre-enforcement review is to prevent a party subject to administrative action from being bludgeoned into compliance with some substantial requirement it contends is contrary to law. The potential for such coercion occurs solely because liability for civil and criminal penalties for non-compliance may accrue and accumulate to ruinous levels while an agency's failure to seek enforcement of its orders precludes access to a judicial forum where the complainant may obtain review of its contentions. *Cf. Abbott Laboratories v. Gardner, supra*, 387 U.S. at 152, 87 S.Ct. at 1517, 18 L.Ed.2d at 693; *St. Regis Paper Company v. United States*, 368 U.S. 208, 226–7, 82 S.Ct. 289, 299–300, 7 L.Ed.2d 240, 253 (1961); *United States v. Morton Salt Co.*, 338 U.S. 632, 654, 70 S.Ct. 357, 369, 94 L.Ed. 401, 416 (1950). *See generally* "The Supreme Court, 1966 Term," 81 *Harv.L.Rev.* 69,225–31 (1967). Given the dominant purpose of pre-enforcement review, attention should generally be directed toward risks existing during the period prior to institution of enforcement proceedings for purposes of assessing the risks attendant upon non-compliance.[50] For

**48.** See notes 16 and 17 pages 1074–1075, *supra*.

**49.** See *A. O. Smith v. FTC, supra*, 530 F.2d at 524, n. 9.

**50.** The above statement assumes an absence of unusual circumstances surrounding the mode or nature of administrative enforcement which may serve to create additional risks which attach solely to such an enforcement proceeding. Where unusual circumstances are present, they must be considered in the evaluation of risks extant during the period prior to the bringing of enforcement proceedings. A clear example of unusual circumstances stemming from the na-

ture of certain enforcement mechanisms was present in *Gardner v. Toilet Goods Ass'n, supra*, where a pre-condition to commencement of enforcement proceedings, either injunctive, criminal or seizure, was an administrative determination that certain cosmetics were "adulterated" and thus unsafe, a derogatory label that in and of itself would carry serious consequences for the cosmetic industry. *See Id.*, 387 U.S. at 172, 87 S.Ct. at 1529, 18 L.Ed.2d at 708. *See also Abbott Laboratories v. Gardner, supra* (drugs must be considered "misbranded") before enforcement remedies ripen). By contrast no unusual circumstances appear in the instant cases with the result that institution of enforce-

reasons that will appear subsequently it is not necessary to definitively resolve this issue and thus categorically reject or accept the exercise of pre-enforcement review. *Cf. Brown & Williamson Tobacco Company v. Engman, supra* at 67,674.

Similarly, it appears that one of the twin branches that comprise the horns of plaintiffs' alleged dilemma may be absent in the context of the CPR program. However, unlike the '74 LB Form where the risks of non-compliance may be ephemeral, it is a significant burden of compliance which is argued by the FTC to be lacking with respect to the CPR forms. Basically, the Commission urges that so little effort is needed to complete the required forms that they can hardly be said to have a significant effect on the plaintiffs' day-to-day conduct or to require plaintiffs "to commit substantial resources" to achieve compliance. In particular it points to an estimate of 30 man-hours as an average respondent reporting burden,[51] a figure which is apparently based on rough approximations of completion times for similar past surveys and a pre-test of the CPR forms conducted in early 1973.[52] However, the agency in developing that estimate did acknowledge the fact that the completion burden rises proportionately with the size, diversification and structural complexity of the respondent.[53] Since the CPR forms are directed to the 1000 largest domestic manufacturing firms it can be assumed that some percentage of the CPR respondents will exceed the Commission's compliance estimates by a significant margin.

The record is somewhat sparse in terms of facts adduced by the plaintiffs to demonstrate their view of the CPR burden for

purposes of supporting their claim that the program has a direct day-to-day impact on the conduct of their respective business affairs. For example, an affidavit submitted by the comptroller of one of the plaintiffs indicates a reporting cost of approximately $50,000.[54] However, this estimate was based in part on the burden stemming from a particular part of CPR Form-1 that required a reporting company to rank its status within each product class. Because this particular item was withdrawn by the Commission at the time it denied the various motions to quash,[55] these cost estimates can no longer be treated as sound in view of their reliance on a now discarded requirement which one company opined could cost, by itself, anywhere from $20,000 to $50,000.[56] An affidavit not specifically relying on the burden caused by the deleted item was submitted which suggests a compliance cost of $75,000 for a particular company.[57] However, the basis for the estimate was predicated upon that reporting company supplying data with a much higher degree of accuracy than that required by the Commission for completion of the CPR form.[58]

In addition to the financial costs of compliance, plaintiffs also assert that the information sought by the CPR forms is rendered confidential under section 9 of the Census Act [59] by virtue of its previous submission to the Census Bureau. Thus they urge the very act of compliance has significant costs for them in terms of mooting their claims of confidentiality. Added to that is the fact that although much of the information sought by the CPR form is contained in plaintiffs' 1972 census reports, the categories used to classify the census data were based on a 1967 version of the

ment proceedings does not trigger any risk of a serious loss of "public confidence" in a "sensitive industry." *Cf. Id.*, 387 U.S. at 153, 87 S.Ct. at 1517, 18 L.Ed.2d at 694.

51. MX–15 at 12.

52. *Id.*

53. *Id.* at 12–3.

54. See MX–72, ¶ 7.

55. MX–103 at 2.

56. See MX–93.

57. See MX–114.

58. This is especially true where the CPR forms allow a company to employ "best estimates." See MX–4 at 1.

59. 13 U.S.C. § 9.

Standard Industrial Classification ("SIC") codes. Since the CPR forms require use of product class codes derived from a later and more detailed version of the SIC codes, the plaintiffs claim an additional impact stemming from their burden of compliance, in that they will have to modify and reclassify the data contained on their census reports to the extent that it reflects shipment values within changed product codes. However, this may not be a potent stumbling bloc since the CPR forms do not require the designated information to come from any particular source.[60]

█ Whatever difficulties exist with respect to the first horn of the dilemma, the day-to-day impact of the reporting requirements, there is no question that plaintiffs do indeed bear substantial risks of non-compliance in the CPR context. Although the Commission stated during a court hearing held on March 31st that no notices of default would be issued prior to the institution of enforcement proceedings against noncomplying CPR recipients,[61] the Court is not free to give any weight whatsoever to that concession. Unlike the preliminary injunction context [62] where such a concession adequately serves to immunize plaintiffs from any immediate irreparable harm possibly stemming from the imposition of civil penalties, the Supreme Court has clearly indicated that for purposes of assessing the hardship to the parties of withholding review, the risks attaching to non-compliance in the absence of a forum where the complaining party may air its grievances must be measured as they stood at the inception of the litigation. *See Abbott Laboratories v. Gardner, supra,* 387 U.S. at 154, 87 S.Ct.

at 1518, 18 L.Ed.2d at 694. As a result, risks of non-compliance continue to exist for recipients of orders to file the CPR forms. However, as with '74 LB, for reasons developed below, there is no occasion at this juncture for the Court to categorically accept or reject the exercise of pre-enforcement review with respect to plaintiffs' challenges to the CPR program.

## VI. *The Commission's Motion to Dismiss, Stay or Transfer*

By its motion to dismiss, stay or transfer the Commission seeks to have the court either dismiss the CPR litigation or transfer it to the District of Columbia where enforcement proceedings have now been brought.[63] As to the '74 LB cases the agency is, in essence, requesting a stay to allow it to institute enforcement proceedings in the District of Columbia, followed by a dismissal or transfer of these actions to the enforcement forum.

█ The basic concept behind a dismissal or transfer of these cases is to minimize the multiplicity of forums that must adjudicate the issues raised here while also assuring an adequate forum under the Administrative Procedure Act, 5 U.S.C. § 704. The problem of multiple institution of actions in this immediate context was recognized in *Abbott Labs.* In that case Justice Harlan suggested transfer pursuant to 28 U.S.C. § 1404(a),[64] a stay of all but one action pending conclusion of that single action or a discretionary dismissal in favor of similar or related litigation pending elsewhere as methods by which the spectre of multiple actions may be resolved. *See Abbott Laboratories v. Gardner, supra,* 387 U.S. at

---

60. See MX–103 at 13.

61. Docket Item 197, Civil Action No. 75–15 at 102.

62. See note 39 page 1079, *supra* and accompanying text.

63. At the point the Commission's Motion to Dismiss, Stay or Transfer was filed no enforcement proceedings were pending as to the CPR plaintiffs. See discussion *infra* at 1079. Thus, its motion sought a stay in those cases to permit it to commence such enforcement pro-

ceedings. Since those proceedings have now matured into a reality, there is no reason to address the Commission's request for a stay insofar as the CPR pre-enforcement actions are concerned.

64. 28 U.S.C. § 1404(a) provides that:
"(a) For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."

154–6, 87 S.Ct. at 1518–19, 18 L.Ed.2d at 694–5. Since that time several courts have faced this issue and either dismissed pre-enforcement actions in favor of pending enforcement proceedings or transferred pre-enforcement litigation to the district where enforcement proceedings have been brought. *See General Motors Corporation v. Volpe*, 321 F.Supp. 1112 (D.Del.1970), *aff'd* 457 F.2d 922 (3d Cir. 1972) (dismissal); *Brown & Williamson Tobacco Company v. Engman*, CCH Trade Reg.Rep. ¶ 60,607 (S.D.N.Y. Nov. 5, 1975) (dismissal); *General Electric Company v. FTC*, 411 F.Supp. 1004 (N.D.N.Y.1976) (transfer). *Accord, Ford Motor Co. v. Coleman*, 402 F.Supp. 475 (D.D.C.1975) (three-judge court). *See also, Floersheim v. Engman*, 494 F.2d 949 (D.C. Cir. 1974). Thus ample authority exists for the proposition that the institution of enforcement proceedings within a reasonable time will justify dismissal or transfer of a previously filed pre-enforcement action.

One inquiry that must be addressed is whether the CPR enforcement proceedings already begun or the proceedings to be commenced with respect to '74 LB on or before May 17, 1976,[65] fall within the concept of reasonably prompt institution. *See, e.g., General Motors Corp. v. Volpe*, 457 F.2d 922, 923–4; *Ford Motor Company v. Coleman, supra*, 402 F.Supp. at 486 and n. 30. The earliest date that enforcement proceedings could have been instituted under the CPR program was February 6, 1976, as no CPR recipients were under any duty to file completed forms prior to that time.[66] The duty to file the '74 LB reports attached 150 days after receipt of the orders which generally occurred in the latter part of August, 1975. Thus, the initial filing deadline was sometime in late January. However, since

at least 100 companies had been granted extensions of the filing date or had otherwise indicated an intent to file notwithstanding the passage of the deadline,[67] it is problematic to utilize the original 150 day limit as fixing the point where the Commission was free to commence enforcement proceedings. In fact, Commission counsel represented at oral argument that at least one extension had been granted to April 30th in the LB program and that some CPR deadlines extended well into April.[68] While the Court recognizes that the Commission is by no means legally obliged to forebear from instituting enforcement action until *all* compliance times for *all* recipients have passed, there are interests that arguably are best served by deferring commencement of such proceedings until the approximate magnitude of non-compliance can be ascertained.

The second factor bearing upon the time frame surrounding Commission commencement of enforcement proceedings is the stipulation developed on January 29, 1976,[69] in which the Commission agreed not to take enforcement action against the plaintiffs prior to the Court ruling on the plaintiffs' preliminary injunction motions or June 11th, whichever first occurred. The motivation behind this stipulation, which was negotiated before the Third Circuit vacated this Court's earlier preliminary injunctions against commencement of enforcement proceedings, was to provide this Court with ample time to decide plaintiffs' motions for preliminary injunctive relief without having to issue a temporary restraining order and undertake the ensuing burden of issuing an extensive opinion within a 10-day time limit. *See* Fed.R.Civ.Proc. 65(b), 52(a). Moreover, to further serve that purpose, at

**65.** At a hearing held on March 31, 1976, the Commission agreed to bring enforcement proceedings against the '74 LB plaintiffs within 45 days.

**66.** See MX–103 at 31–2.

**67.** FTC Exhibit AA at 2.

**68.** Docket Item 197, Civil Action No. 75–15 at 177, 183.

**69.** Docket Item 192, Civil Action No. 75–15. Although the stipulation was formulated on January 29th, it was not formally executed until the latter part of March because of continuing differences over phrasing of certain passages and the inadvertent misplacing of a handwritten draft.

the Court's urging the stipulation of forebearance was extended from whatever hearing date the Court intended to establish until June 11th. In addition, the agreement expressly recognized the Commission's right to apply for relief from its commitment if the ensuing appellate opinion undercut the legal predicate for preliminary injunctive relief in these cases. As a result, following argument on March 31st, I removed this self-imposed bar on the agency's efforts regarding enforcement proceedings.

█ Given the foregoing any enforcement proceedings commenced to date under the CPR program, or filed for '74 LB within the 45-day deadline set at the March 31st hearing are, or will be, deemed to have been promptly instituted. *See Brown & Williamson v. Engman*, CCH Trade Reg.Rep. ¶ 60,607 (S.D.N.Y. Nov. 5, 1975) (enforcement proceeding commenced two months and two days after pre-enforcement challenge filed was considered to be promptly instituted). This conclusion is also strengthened by concessions from plaintiffs' counsel that they had no objection whatsoever to the Commission's taking 45-days to commence enforcement proceedings.[70]

█ The next inquiry must be whether any interests have been advanced by the plaintiffs that will be sufficiently prejudiced by a transfer or dismissal of these cases to overcome the obvious benefit to the interests of justice inherent in reducing the number of forums that must pass on the same set of issues. Various arguments were advanced by plaintiffs but the Court finds them either to be without merit or supportive of transfer, as opposed to dismissal, of these cases. First, they suggest that an enforcement action, being a summary proceeding designed to allow the Commission to enforce its orders, will be ill-suited to their attacks upon the CPR and LB programs *qua* programs. In addition, they seem to suggest that the summary nature of such a proceeding may result in qualita-

tive differences regarding the claims they have asserted as plaintiffs in this district. This position is essentially meritless because there is really no substantial issue regarding the ability of the plaintiffs to assert as defenses in an enforcement proceeding the issues they have raised here.[71] However, to the extent that an enforcement tribunal *might* seek to focus solely on a particular order or set of orders and in so doing somehow avoid treating the *programs'* legality, this argument seems to militate in support of a transfer of these cases to the enforcement forum as opposed to dismissal. Simply stated, a transfer would enable the plaintiffs to seek consolidation of these cases with the enforcement proceedings and thus eliminate this problem. *See, General Electric Company v. FTC, supra*, 411 F.Supp. at 1011. While the same interest could be served by a discretionary non-prejudicial dismissal of these actions, transfer seems to be a more direct device for accomplishing this purpose.

█ Plaintiffs earlier developed position regarding an inability to join the Comptroller-General as a party to an enforcement proceeding, *supra* at 1080–1081, also suggests transfer as a preferable alternative to dismissal since consolidation would appear to resolve that problem as well. *GE v. FTC, supra*, 411 F.Supp. at 1011. Plaintiffs also urge that rather than having this Court stay, dismiss or transfer, the better course would be for the other pre-enforcement forum, the Southern District of New York, or the CPR enforcement forum, the District of Columbia, to stay their proceedings in favor of this Court. Aside from the Commission's argument that this reveals the plaintiffs as mere forum-shoppers, the plaintiffs' suggestion will not eliminate the problem of multiple forums and satisfy the strong policy interests supporting a result that will preclude a proliferation of judicial decision making. *See, GE v. FTC, supra*, 411 F.Supp. at 1011. In any event, as be-

**70.** See Docket Item 197, Civil Action No. 75–15 at 177–83. However, plaintiffs' counsel did vehemently oppose the *institution* of enforcement proceedings as they correctly perceived such

action as inimical to their interest of obtaining summary judgment in this forum.

**71.** See discussion and authorities, supra at 1079.

tween courts, the enforcement forum would appear to have the least justification to issue a stay, especially if the pre-enforcement actions were to be transferred there, since, assuming in personam jurisdiction over these plaintiffs, it is the sole forum that can readily adjudicate both plaintiffs' challenges *and* the Commission's demands for enforcement.

▮ Finally, plaintiffs also point to the extensive briefs that have been prepared in-support of the summary judgment motions as a ground for refusing to transfer or dismiss these cases in favor of the enforcement forum. However, whatever limited degree of inconvenience *may* result in this regard, it cannot possibly outweigh the benefit produced by a transfer that satisfies the interests of justice by removing the need for multiple judicial resolution of the same issues. Moreover, it is not at all clear that these particular briefs have been prepared in vain. First, a transfer of these cases will leave both the summary judgment motions and briefs extant. In addition, since the issues raised in this district will be the same as those posed in an enforcement proceeding, the current briefs are adaptable with little more than a change of cover pages to use in that context. Moreover, the plaintiffs' argument is totally undermined because they, along with the Commission, chose for tactical reasons not to adopt a suggestion from the Court that they postpone briefing of any motions until after the Third Circuit had ruled on the appeals in the '73 LB case.

▮ As an alternative, plaintiffs urge that any enforcement proceeding must be asserted as a compulsory counterclaim under Fed.R.Civ.Proc. 13(a) and thus an injunction should issue against the Commission's attempts to bring enforcement actions in a forum other than Delaware. As support for their position they point to *Columbia Plaza Corporation v. Security National Bank*, 525 F.2d 620 (D.C.Cir. 1975) where the denial of such an injunction was deemed to be erroneous. However, there is a serious question as to whether *Columbia Plaza* would be followed by the Third Cir-

cuit and further, it is readily distinguishable.

There appears to be contrary authority to *Columbia Plaza* in this Circuit. In *General Motors Corporation v. Volpe* a similar argument was made by GM as a device to avoid a dismissal of its pre-enforcement challenge in favor of a subsequently filed enforcement proceeding in another forum. *See Id.*, 321 F.Supp. at 1126, n. 24. Although the argument was not directly met in the district court, that court's dismissal, and the Third Circuit's affirmance, both indicated that the reasonably prompt institution of enforcement proceedings justified a refusal to exercise the court's pre-enforcement jurisdiction, a result that is fundamentally inconsistent with the concept of an enforcement proceeding as a compulsory counterclaim to a previously filed pre-enforcement action. *Compare General Motors Corporation v. Volpe*, 457 F.2d 922 (3d Cir. 1972) and *General Motors Corporation v. Volpe*, 321 F.Supp. 1112 (D.Del.1970) *with Columbia Plaza v. Security National Bank, supra.*

*Columbia Plaza* can be distinguished because neither of the related claims being prosecuted in the two judicial forums present in that case involved the assertion of rights under a special Congressionally designed enforcement scheme which provides the district courts with jurisdiction over suits by the Commission to enforce its orders. 15 U.S.C. § 49. This is especially important because application of *Columbia Plaza* in the instant context would serve to completely eviscerate the Congressionally-mandated enforcement mechanism. Since pre-enforcement challenges, by definition, are filed well before the time that compliance is due and thus prior to the point that an enforcement proceeding could be maintained, a decision treating the latter as a compulsory counterclaim to the former would invariably guarantee not only the complainant's choice of forum but insure that the enforcement action could only be advanced within the scope of the earlier filed action. Moreover, where the challenge is directed, as in this case, to an administrative action of broad applicability,

there is a significant probability that pre-enforcement suits would be brought in more than one judicial district. Utilization of the compulsory counterclaim and injunction route in these situations would lead to either the undesirable result of multiple judicial determination of the same issues or to complex transfer or pre-trial consolidation problems under 28 U.S.C. §§ 1404(a) and 1407. Lastly, the *Columbia Plaza* decision explicitly recognized that the policy underlying Rule 13(a), namely the adjudication of related causes of action in a single forum, is served equally as well by a transfer under section 1404(a) as by an injunction preventing one party from proceeding elsewhere. *Columbia Plaza, supra*, 525 F.2d at 627, 629, n. 65.

▮ Finally, and belatedly [72] plaintiffs urge this Court should not transfer these pre-enforcement actions to the District of Columbia because the Commission will not be able to join all or most of the plaintiffs in CPR and '74 LB enforcement proceedings in the District of Columbia. The underpinning of plaintiffs' position is that the Commission can point to no statutory authority which would authorize extraterritorial service of process in an enforcement action. As a consequence of the Commission's alleged legal disability, plaintiffs urge the Commission cannot obtain in personam jurisdiction over most of them.

At the outset in responding to this argument it must be borne in mind that the amenability of the plaintiffs to service of process in the District of Columbia enforcement actions is an issue ultimately to be decided by that forum. Therefore, I believe that any direct discussion of the merits of plaintiffs' contentions regarding difficulties in obtaining in personam jurisdiction would be inappropriate and must thus await consideration by the enforcement tribunal. However, some observations are proper with respect to the relationship of this po-

tential issue to the contemplated transfer of these pre-enforcement review actions.

Plaintiffs have submitted no facts to the Court which support their claim that they cannot be considered present in the District of Columbia so as to obviate the asserted need for extraterritorial service. While the record before me does indicate that none of the plaintiffs are incorporated in the District, there is simply nothing of a factual nature which shows, for example, whether any of the plaintiffs maintain offices or conduct business there. As a result of these deficiencies, it is apparent that the legal arguments raised by plaintiffs regarding the statutory limits on service in the District may well be lacking a factual predicate. Moreover, even if plaintiffs are able to develop a factual record in the enforcement forum, their contentions regarding a lack of extraterritorial service under 15 U.S.C. § 49 may prove to be groundless.[73] In addition, defects in in personam jurisdiction may be waived and there is a significant possibility that, assuming *arguendo* plaintiffs are correct, many of the plaintiffs would find it in their interests to waive any objections regarding service of process. For example, should a substantial number of the plaintiffs be amenable to service within the District, the remaining plaintiffs may decide that they should waive objections stemming from a lack of in personam jurisdiction. This is because such a course could be preferable to being relegated to one of several enforcement forums which, without the bulk of the parties before it, would be likely to stay all proceedings pending completion of the District of Columbia enforcement actions. Thus, rather than sit idle during the primary adjudication of issues extremely important to them, the remaining plaintiffs might choose to actively participate in the District of Columbia enforcement proceedings.

Lastly, if the plaintiffs contentions in this regard eventually prove correct, the result

---

**72.** On April 21st, plaintiffs filed without leave of Court a "Supplemental Memorandum in Opposition to the Commission's Motions to Stay, Transfer or Dismiss."

**73.** The Court must re-emphasize that it is not making any comment whatsoever on the actual merits of plaintiffs' claims.

will be a multiplicity of enforcement actions in numerous judicial districts. At that point a referral of the enforcement actions to the Judicial Panel on Multidistrict Litigation would be a virtual certainty in order to achieve a consolidation of all the cases for pretrial purposes. Given that circumstance, the Court is not convinced that the interests of justice will be ill-served by transferring these cases to the enforcement forum since, as a result of a consolidation with the enforcement actions, or by consideration as "tag-along" cases under the Panel's rules, all the actions, both pre-enforcement and enforcement, would thereafter likely move together.

## VII. *The Plaintiffs' Motion to Stay Consideration of the Commission's Motion to Dismiss, Stay or Transfer*[74]

The plaintiffs in both '74 LB and CPR countered the Commission's motion to dismiss, stay or transfer on April 21st by filing a motion in this Court requesting it to stay disposition of the aforesaid Commission's requests. The plaintiffs' motion filed in this Court was motivated by the fact that on April 20th they moved before the Judicial Panel on Multidistrict Litigation pursuant to 28 U.S.C. § 1407, requesting that Panel to transfer to this Court all pending '74 LB and CPR cases for coordinated and consolidated pretrial proceedings.

Initially, it is noted the plaintiffs' motion to stay can be considered to be in sharp contrast to their position taken at oral argument on March 31st wherein they were opposed to any stay and were pressing for an early decision. The Court can only assume the abrupt change in plaintiffs' tactics is attributable to two recent developments. First, the Commission made a significant contribution toward achieving its avowed goal of presenting all litigation to one tribunal by withdrawing its '73 LB orders against all non-complying corporations. The second significant occurrence was the transfer of the CPR pre-enforcement actions pending in the Southern District of New York to the CPR enforcement forum, the District of Columbia.

The plaintiffs' motion would upon first blush appear to present a potential Catch-22 problem, *viz.*, should this Court await the outcome before the Judicial Panel on Multidistrict Litigation or should that Panel first have the advantage of a ruling which might obviate in whole or in part the necessity for that Panel having to make a ruling in the first instance. In making this determination, one significant observation can be made. The filing of a motion with the Judicial Panel on Multidistrict Litigation in and of itself has no affect on the jurisdiction or power of this Court. *See*, Jud.Pan.Mult.Lit.R. 16, 65 F.R.D. 253, 264–5 (1975).[75] Accordingly, the decision of whether to await further action by the Panel or rule at this point is within the sound discretion of this Court and should be determined on a basis that will serve the interests of justice and notions of judicial economy.

With respect to the CPR litigation, it seems clear that this Court should not stay its hand, but instead transfer these cases to the enforcement forum forthwith. This is because the effect of a transfer by this Court will be to eliminate the multiple district character of the CPR litigation since all pre-enforcement and enforcement actions with respect to the CPR Program will then be pending in the District of Columbia. Since this action may well obviate the need for consideration of plaintiffs' motion by the Panel, the interests of justice are best served by denying the plaintiffs' motion to stay with respect to the CPR litigation.

**74.** For an extended discussion of the Commission's motion to dismiss, stay or transfer see pages 1085–1089.

**75.** "The pendency of a motion or order to show cause before the Panel concerning transfer of an action pursuant to 28 U.S.C. § 1407 does not affect or suspend orders and pretrial proceedings in the district court in which the action is pending and does not in any way limit the pretrial jurisdiction of that court. A transfer shall be effective when the transfer order is filed in the office of the clerk of the district court of the transferee district." 65 F.R.D. 253 at 264–5.

The situation surrounding the LB '74 cases is somewhat more complex as pre-enforcement actions are currently pending in two districts with the imminent likelihood of enforcement proceedings being commenced in a third district. Obviously, action by this Court alone cannot by itself resolve the issue currently before the Panel on Multidistrict Litigation. As a result a stay of the '74 LB cases pending disposition by the Panel might well be appropriate. However, as a practical matter this course if not a viable option. Simply stated, it is impossible to both transfer the CPR cases immediately and yet stay the Court's hand with respect to transferring '74 LB. Not only did some [76] of the plaintiffs raise LB and CPR claims in the same actions, but they also plead causes of action as to both programs in a hopelessly intermingled manner. As a result, the Court is faced with a choice. Should it allow itself to be controlled by the vagaries of plaintiffs' pleading styles and stay both programs, notwithstanding the fact that immediate transfer of the CPR cases would best serve the interests of justice? Or, should it transfer all the cases at this point, subject only to a condition that the Commission institute enforcement proceedings with respect to '74 LB prior to May 17th in the District of Columbia, notwithstanding the potentially limited efficacy of that action as a means of obviating action by the Panel? Given these options, neither of which is wholly perfect, the Court must conclude that the better course is the latter since it will serve the interests of justice in larger measure, especially in the CPR context, by reducing the multiplicity of jurisdictions that must pass on the same issues. Accordingly, all CPR and '74 LB cases pending in this district will be transferred to the District of Columbia

subject to the condition that the FTC commence enforcement proceedings there against the non-complying recipients of '74 Form LB by May 17, 1976.

---

**76.** Civil Action Nos. 75–56, 76–19, 76–20 and 76–22. The plaintiffs' pleading choice was by no means foreordained since at least one party chose to file two separate civil actions challenging the LB and CPR programs. See Civil Action Nos. 76–56, 76–60.

One can argue that *all* the '74 LB plaintiffs should not be penalized by virtue of the pleading styles of a minority of the plaintiffs. Thus, one option available to the Court is the is-

suance of a stay pending institution of enforcement proceedings or a decision by the Panel in all LB cases not commingled with CPR counts. However, this course would have the effect of fragmentizing the LB cases between two districts. Since that result is fundamentally at odds with the purpose of a transfer in this context, namely reducing the multiplicity of courts that must pass on the same issues, the LB cases must be treated together.